**WAYNE–GOSSARD CORPORATION,**
Plaintiff,

v.

**MORETZ HOSIERY MILLS, INC.,**
Defendant.

**Civ. A. No. ST–C–73–24.**

United States District Court,
W. D. North Carolina,
Statesville Division.

Oct. 1, 1974.

Charles B. Park, III, W. Thad Adams, III, Parrott, Bell, Seltzer, Park & Gibson, Joseph W. Grier, Jr., Grier, Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N. C., for plaintiff.

David Rabin, Greensboro, N. C., Richard A. Williams, Williams, Pannell & Matthews, Newton, N. C., for defendant.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, Chief Judge.

The plaintiff, Wayne-Gossard Corporation, brings this civil action against the defendant, Moretz Hosiery Mills, Inc. seeking compensatory and injunctive relief for the alleged infringement of a patent for a "foot cover" and the method of manufacturing such cover. The defendant denies infringement and asserts the defenses of invalidity, intervening rights, and lack of jurisdiction for failure to join an indispensable party. The matter was heard before the Court, without a jury, at the July 1974 term of this Court in Statesville, and after full consideration of the evidence, arguments of counsel, and the briefs, the Court now makes and enters its findings and conclusions.

## FINDINGS OF FACT

1. The plaintiff, Wayne-Gossard Corporation, hereinafter referred to as Wayne-Gossard, is an Indiana corporation with its principal office in Humboldt, Tennessee, and the defendant, Moretz Hosiery Mills, Inc., hereinafter referred to as Moretz, is a North Carolina corporation with its principal office

and manufacturing plant in Newton, which is within the Western District of North Carolina. The accused foot covers were manufactured by Moretz at its manufacturing plant in Newton.

2. On October 23, 1962, Patent No. 3,059,458 was issued by the United States Patent Office to Edgar Gary Sarbo, the Inventor, who resides in Vienna, Austria, for a "Foot Cover And Method Of Manufacturing Same," and the rights to the application were assigned to the firm of Bruder Sarbo, of Vienna, Austria. On December 2, 1964, Bruder Sarbo assigned all rights, title and interest in said Patent to Renfro Hosiery Mills Company, a North Carolina corporation with its principal office and place of business in Mount Airy, North Carolina. On or about January 26, 1965, Renfro Hosiery Mills Company assigned to May Hosiery Mills all rights in said Patent pursuant to an agreement between them dated December 22, 1964, and May Hosiery Mills assigned all rights in said Patent to Wayne Knitting Mills pursuant to an agreement between the parties dated June 17, 1965. That as a result of a corporate merger the name of Wayne Knitting Mills was changed to Wayne-Gossard Corporation and Wayne-Gossard thereupon acquired all rights in said Patent on or about January 31, 1967.

3. Under the assignment and agreement, Wayne Knitting Mills and the May Company brought an action for an infringement of the Patent against Russell Hosiery Mills. The district court held the Patent to be valid and infringed by Russell Hosiery Mills, 274 F.Supp. 934 (M.D.N.C.1967), but the Court of Appeals held Claim 3 of the Patent invalid for indefiniteness and overclaiming. Wayne Knitting Mills v. Russell Hosiery Mills, 400 F.2d 964 (4th Cir. 1968). After the entry of the final judgment in the Middle District of North Carolina, an action pending in this court between the parties to this action was dismissed with prejudice with respect to any claim of infringement arising out of Claim 3 of the original Sarbo Patent.

4. A Reissue Application was filed on November 12, 1968 by Sarbo and Wayne-Gossard, and Reissue Patent No. RE 26,667 was issued on September 23, 1969 by the United States Patent Office. In the Reissue Patent, Claim 3 of the original Sarbo Patent No. 3,059,458 was cancelled and the new Claims 4 and 5 were added directed to the foot cover product. These new claims incorporated language which the Court of Appeals found to be lacking in the original Patent, 400 F.2d 967, disclosing how the patented device should be constructed so as to position the elasticized rim below the ankle in the place where it can perform its theretofore undiscovered—and hence new and novel—function. The Reissue Patent in suit was issued by the United States Patent Office after consideration of the decisions of the district court and the Court of Appeals in the prior litigation; all of the prior art patents before the court during said litigation; and independent investigation and evaluation of the prior art by the Patent Examiner.

5. In an action filed October 31, 1969, in the Middle District of North Carolina by Wayne-Gossard against Russell Hosiery Mills, Judge Robert A. Merhige, sitting by designation, held the Reissue Patent infringed by Russell's Styles 1331, 1333 and 1339. The Court of Appeals for the Fourth Circuit affirmed. Wayne-Gossard v. Russell Hosiery Mills, 483 F.2d 770 (1973). This case was decided by the Circuit Court on August 30, 1973.

6. On October 3, 1973, Wayne-Gossard filed this action alleging that Moretz's styles 2445 (PX 1); 22445 (PX 2); 2446 (PX 3); 2447 (PX 5); 22447 (PX 6); 2480 (PX 9); and 22480 (PX 10) infringe Claims 4 and 5 of the Reissue Patent, and styles 2444 (PX 7); 22444 (PX 8); 2448 (PX 11) and 22448 (PX 12) infringe Claim 4 of said Patent. Without prejudice to its other claims or assertions, Wayne-Gossard waived all claims for damages

arising out of any alleged infringement of the Reissue Patent by virtue of (1) Moretz's manufacture of any foot covers prior to September 23, 1969; (2) all sales of foot covers manufactured prior to September 23, 1969 but sold at a later date; and (3) the manufacture and sale of knitted foot cover blanks in inventory on September 23, 1969, which blanks were later processed into foot covers and sold.

7. The product involved in the Patent is a knitted article of ladies footwear designed to be worn on the foot without showing above the shoe. It is customarily worn without conventional hose or socks to give the "bare-legged" look. Prior to Sarbo's method and product in 1958, shoe-top-length foot socks were available in the market but were made either from flat knitted fabric, which was then cut and sewn into the desired shape and provided with a sewn-in elastic rim around the foot entry opening or knitted as a regular sock, having reciprocated heel and toe pockets which would then be cut down at the top and provided with a sewn-in elastic rim around the foot entry opening. These shoe-top-length socks were not only comparatively expensive to manufacture because of the cutting and sewing required but also were rather uncomfortable to wear because of a heavy band or rim of elastic sewn around the foot opening which tended to burrow into the foot of the wearer due to the pressure of the shoe. Sewing and cutting are time-consuming operations requiring skilled operators and resulting in considerable waste. The plaintiff's foot cover as outlined in Claims 4 and 5 of the Reissue Patent and as found by Judge Merhige and shown by the evidence here is characterized by a seamless tubular elasticized rim adapted to form the foot entry opening with a seamless tubular body having a length greater than that of the rim and connected therewith. The foot cover has a seam formed at the end of the body opposite the rim to form a symmetrical pouch-like body which can be adapted to function as tip, sole and heel portions and can be worn in reversed positions. The novel function of the foot cover is that the elasticized rim is positioned below the ankle in a foot hugging stretched condition and is completely concealed from view when worn with low-cut shoes. It has no definite toe and heel portions and can be conveniently worn in reversed positions upon the foot. The rim and the body, each, respectively, consists of the same knitting structure throughout its axial length and throughout its entire periphery. In summary, the finished product consists simply of a short length of circular, knit, seamless, tubular fabric, similar to that employed in making the top of seamless hose, having several courses of rubber laid in at what is to become the top of the foot cover, followed by a number of courses of plain knit fabric, both of which are knitted on conventional circular knitting machines in a manner similar to conventional knitting of seamless hosiery. In practice, the sock is knitted of stretch yarn, so as to have the capacity to stretch about a wide variety of foot sizes and conform to the lower portion of the foot which normally lies within the shoe. The sock can be made on practically any type of circular knitting machine and can be closed along the bottom by a conventional looping operation or seamed with a straight machine seam by relatively unskilled persons. It does not require boarding or other shaping operation prior to marketing.

8. The Sarbo type foot cover has had tremendous commercial success and quickly became a staple item in the hosiery industry. The sales of this type foot cover by Wayne-Gossard and Renfro alone amounted to more than thirty-six million pairs from 1965 to 1973. Since the Reissue Patent was issued on September 23, 1969, Wayne-Gossard and Renfro have marked their packages containing foot covers made and sold by them with the Sarbo Reissue Patent No. 26,667.

9. All of the prior art relied upon by Moretz at the trial was considered and cited by the Patent Office in its consideration of the original Sarbo Patent and its reissue.

10. On the question of infringement the evidence shows that Moretz began manufacturing foot socks similar to May's style 1400 foot socks (PX 21) in 1965 when, in response to a request from its customer, J. W. Landenberger & Co., it copied a foot sock sent to it by Landenberger and began manufacturing and selling foot socks corresponding to its style 2447 (PX 5). At that time Landenberger was one of the largest distributors in the country of cut-and-sewn shoe-top-length foot socks. Thereafter, Moretz expanded its line of the shoe-top-length foot socks to include styles 2445 (PX 1); 2446 (PX 3); 2447 (PX 5); 2444 (PX 7); 2480 (PX 9), and 2448 (PX 11) all of which correspond to May style 1400 (PX 21) except for the use of different types of yarns or fabric, and it continues to make one of these styles 2446 (PX 3) up to the present time. In late 1972, after Judge Merhige's decision in Wayne-Gossard v. Russell holding that Russell's contour seam foot cover did not avoid infringement, Moretz discontinued manufacturing and selling its styles 2445 (PX 1); 2447 (PX 5); 2444 (PX 7); 2480 (PX 9), and 2448 (PX 11), hereinafter referred to as its 2400 series, and began making and selling styles 22445 (PX 2); 22447 (PX 6); 22444 (PX 8); 22480 (PX 10), and 22448 (PX 12), hereinafter referred to as its 22000 series, and continues to make and sell such styles.

11. Moretz's foot sock styles 2444, 2445, 2446, 2447, 2448, and 2480 correspond in every way to the language of Claim 4, and styles 2445, 2446, 2447 and 2480 correspond in every way to the language of Claim 5 of the Sarbo Reissue Patent. These foot cover styles are characterized by being extremely elastic and extensible for being fitted in a highly stretched condition upon the asymmetrical configuration of the lower part of the foot of a wearer with the foot cover being of such height as to be positioned below the ankle in foot hugging, stretched condition, completely concealed from view when worn within low-cut shoes and comprise:

(a) A seamless stretchable tubular rim including at least some rubber threads—said rim being adapted to form an opening for a foot entry,

(b) A seamless stretchable tubular body having an axial length greater than that of said rim and connected with said rim,

(c) Said rim and said body, each, respectively, consisting of the same knitted structure throughout its axial length and throughout its entire periphery, and

(d) A seam formed at the end of said body opposite said rim.

12. Moretz's 22000 series foot covers are each knitted with reciprocatory knitting to provide extra fabric to form a heel pouch in the body portion. The reciprocatory knitting is time consuming and more costly to knit than foot covers without it, and by the addition of the extra fabric to form the heel pocket symmetry of the pouch-like body is unobtainable by reason of the projection of the added fabric out of the plane of the non-reciprocated fabric by the heel pocket. While the same type of stitch is used the knitting structure in the reciprocatory knitting has a decidedly different structure because selected needles are placed out of action and retain preselected loops that form the gore line during the reciprocatory knitting. An examination of the foot covers shows a line of demarcation between the knitting structure of one portion of the fabric and the difference in the knitting structure along the gore line which causes the wale lines to form an angle or oblique position in the area of knitting reciprocation manifesting a sharp contrast when compared to the straight wale lines that appear on the opposite side of the fabric in the body portion where there is no reciprocation. Accordingly, there is a difference in the knitting

structure in the body portion as a result of reciprocation which performs a purpose and function.

13. The plaintiff contends that the defendant switched to reciprocatory knitting in its foot covers upon advice of counsel in an effort to avoid infringement after Judge Merhige's decision that Russell's contour seam foot cover did infringe the patent and that the alleged heel pocket serves no useful purpose. In fact, a demonstration in the court room seemed to indicate that the covers made with reciprocation fit the foot form better with the heel pocket turned to the toe. However, the expert witnesses testified that the heel pocket served a useful purpose and the defendant's officers and employees stated that the complaints about slippage in the shoe without the heel pocket ended when it was added. So based upon the greater weight of the evidence the Court finds that it does serve a useful purpose.

14. In the first Russell trial, Judge Gordon found and determined the scope of Claim 3 of the original Sarbo Patent, as appears in footnote 5 on Page 938 of his opinion, to be as follows: "Claim 3 is directed to a combination of elements to form a knitted foot sock, *without reciprocal knitting*, from a piece of seamless circular knit tubular fabric *rather than* from cut and sewn flat fabrics or *from circular knit fabrics involving reciprocation*." (Emphasis added.) In the second Russell case, Russell submitted an interrogatory to the plaintiff relative to its style 1337 foot cover. The foot cover had an elastic seamless knit rim, a body portion with reciprocatory knitting forming a heel pocket. The plaintiff answered the interrogatory advising that no claim was made that such style infringed the Reissue Patent. The evidence indicates that Russell style 1337 is substantially identical to Moretz's 22000 series.

15. The structural limitations of Claims 4 and 5 of the Reissue Patent have been examined carefully, and the Court recognizes that each limitation of a patent claim is vital in a combination

claim. An examination has also been made of Moretz's foot covers having reciprocatory knitting to form a heel pouch or pocket, and they are not responsive to at least two of the claim limitations of Claims 4 and 5 as follows: (1) the body portion does not have the same knitting structure throughout its axial length and throughout its entire periphery; and (2) the body does not form a symmetrical pouch like body due to the different knitting structure, and the added fabric in the heel portion.

16. After this case was scheduled for trial on July 22, 1974, the defendant moved on July 1, 1974 to amend its answer to advance the defenses of intervening rights and misuse of patent. On the same day the defendant filed a Motion for Summary Judgment on the intervening rights defense pursuant to Rule 56, Federal Rules of Civil Procedure. On July 11, 1974, the defendant moved for separate trials to determine its rights under the doctrine of intervening rights. The Court heard the Motions on July 17, 1974 at Statesville, and granted the Motion to Amend but denied the Motions for Summary Judgment and separate trials. The evidence developed at the trial has not added anything to the facts which were before the Court at the hearing on July 17, 1974.

17. The expenditures made by the defendant in preparation for the manufacture of its foot covers have not been made as a result of any reliance upon any action of, or positions taken, by the plaintiff with respect to the Sarbo original or Reissue Patent.

18. Claims 4 and 5 of the Sarbo Reissue Patent are each narrower in scope than Claim 3 of the original Sarbo Patent. After the issuance of the Reissue Patent, Moretz abandoned the packaging which it had used prior to that time and adopted new and different advertising and no longer does business with Landenberger, its principal customer prior to 1972.

19. The defense of lack of jurisdiction for failure to join indispensable

parties was raised by Motion to Dismiss which was heard by the Court on April 22, 1974. After considering the arguments of counsel and the voluminous briefs filed by the parties the Court made and entered its findings and conclusions in a Memorandum of Decision dated June 20, 1974, and denied the Motion. The evidence presented at the trial does not add any additional material facts over and above those before the Court at the hearing on the Motion. The findings are hereby referred to and made part and parcel of these findings.

20. No credible evidence was offered showing any misuse of the Patent.

## CONCLUSIONS OF LAW

■ This action arises under the Patent laws of the United States, 35 U.S. C.A. § 271, and this Court has jurisdiction of the parties and the subject matter under 28 U.S.C.A. § 1338 and 28 U.S.C.A. § 1400.

■ The Reissue Patent is presumed valid, and the burden of establishing its invalidity rests upon the defendant. 35 U.S.C.A. § 282. Its efforts to meet this burden have been focused upon two major contentions (1) obviousness under 35 U.S.C.A. § 103 and (2) that Claims 4 and 5 are broadened reissue claims filed more than two years after the issuance of the original patent and are thus prohibited by 35 U.S. C.A. § 251. Moretz contends that the invention is for a combination of old elements known in the prior art and produces nothing new or novel. It is true seamless knitted tubes, the incorporation of rubber threads in knitted fabrics and the looping, knitting or sewing of seams transversely across the lower end of a piece of tubular fabric were all old and known in the prior art prior to the issuance of the original Sarbo Patent. Thus, it becomes the duty of the Court to scrutinize the claims under the exacting standards established where inventiveness is claimed in an assembly of old elements. In the final analysis, these standards become nothing more

than a determination of the presence or lack of invention. The Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 150 and 152, 71 S.Ct. 127, 129 and 130, 95 L.Ed. 162, set the standard in the following language:

"While this Court has sustained combination patents, it never has ventured to give a precise and comprehensive definition of the test to be applied in such cases. The voluminous literature which the subject has excited discloses no such test. It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention."

\* \* \* \* \* \*

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge."

Judge Learned Hand, speaking for the Second Circuit in Reiner v. I. Leon Co., 285 F.2d 501, stated:

" \* \* \* It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a 'combination': that is to say, it consists of former elements in a new assemblage. All the constituents may be old, if their new concourse would not 'have been obvious at the time the invention was made to a person having ordinary skill in the art' \* \* \* "

The standard was clearly defined by Judge Soper in O. M. I. Corporation of America v. Kelsh Instrument Co., 279 F.2d 579 (4th Cir. 1960), as follows:

"All of the elements of this structure, as the inventor admits, may be found in the prior art and hence the validity of the patent depends upon whether these elements have been put together in such a manner, not obvious to a person skilled in the art, as to produce a new and better result

and thus to justify the issuance of the patent under the established rule. Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910, 912 * * *."

See also City of Grafton W. Va. v. Otis Elevator Co., 166 F.2d 816 (4th Cir. 1948); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4th Cir. 1961).

■ The evidence is convincing that the Sarbo sock was an improvement over the sock known, made and sold at the time it was put on the market. The improved sock was something new which did not exist before. It possessed elements of novelty and utility in kind and measure different and exceeding that which the art taught and which might be expected from those skilled in the art. None of the prior art cited and relied upon by the defendant teaches the combination of elements which produces such a new, different and additional function as shown by this invention. While the obviousness test is difficult to apply, certain guideposts have been erected for our guidance. Judge Hand, in Reiner v. I. Leon Co., *supra,* listed such guideposts as follows: "There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Judge Sobeloff, of the Fourth Circuit, in Entron of Maryland, Inc. v. Jerrold Electronics Corp., *supra,* after quoting the guidelines outlined by Judge Hand, stated: "These general principles have, for many years, guided the decisions of this Circuit." See also Marston v. J. C. Penney Co., 353 F.2d 976 (4th Cir. 1965).

When women decided to wear their dresses shorter and show more of their legs the age of the "bare-legged look" was upon us and, then began the race in the hosiery industry to make the sheerest hose possible. Next came the effort to remove the seam, and the accomplishment of this feat not only eliminated the problem of keeping the seam straight but reduced the cost of manufacture. The next step had to be no hose at all, not just the "bare-legged look," but the bare leg itself. This had one drawback —shoes are not comfortable when worn without socks. So, the scramble was on to manufacture a sock which would make the shoe comfortable but would not mar the beauty and shape of the leg. Thus the need for a Sarbo-type foot cover existed for a long time. The evidence discloses that many in the industry attempted to find the way to fulfill this need. Bobby socks, athletic socks, anklets, footlets, etc. were tried but none caught the fancy of the ladies until the Sarbo sock hit the market. Here was the sock which fulfilled the need and was not expensive to make when compared with all the rest. An expert employee of the May Corporation, plaintiff's predecessor, worked on the problem for four years before he came up with the right combination to produce the sock but by that time Sarbo had his Patent. The need is confirmed by the phenomenal success of the sock since the Patent issued, and further, by the desire of the leading producers in the field to manufacture and sell it. The prior art socks were expensive to manufacture in that they required cutting and sewing which were time consuming and required skilled operators. In addition, the sewn in rubber rim was both unsightly and uncomfortable. None of the prior art socks met the need of covering the foot and being *invisible* when worn with low-cut shoes. The necessary elements were present in the prior art but the combination of such elements to produce the sock was not obvious to those skilled in the art and it took a long time to find it. It was new and novel and provided the answer to the need and demand.

The Court has examined the Patents cited and relied upon by the defendant to show anticipation or lack of invention. It is true that each of the elements of Claims 4 and 5 of the Reissue Patent is

disclosed in one or more of the Patents cited but none of the prior art disclose the combination of such elements.

Claims 4 and 5 of the Reissue Patent are narrower than Claim 3 of the original Sarbo Patent. Judge Winter in writing the opinion in the first Russell case, 400 F.2d 964, 967–968, stated that "Lacking language disclosing how the patented device should be constructed so as to position the elasticized rim below the ankle in the place where it can perform its theretofore undiscovered—and hence new and novel—function, the claim, in our view, is invalid, because it is so broad that it claims as invention that which plaintiffs concede was not new." The plaintiff then filed the Reissue Application containing Claims 4 and 5 describing the invention in such a manner as to narrow the claims and to bring them within the language quoted above.

The defendant seems to contend that since Claim 3 of the original Sarbo Patent was declared invalid by the court as being too broad and therefore has no scope for infringement purposes it likewise has no scope in considering scope of Reissue Claims 4 and 5. In other words, Claims 4 and 5 must be considered broader than Claim 3 since Claim 3 has no scope because of its invalidity. This argument must be rejected.

The defendant cites no case to support its contention and the only case found by the plaintiff wherein such argument was advanced is against the defendant's position. In Hickory Springs Mfg. Co. v. Fredman Bros. Furniture Co., 338 F.Supp. 636 (S.D.Ill.1972), the court held:

"Defendant argues that original claim 3, having been adjudged invalid, has no scope, and that the comparison of reissue 3 must be limited to the scope of other original claims, except original 3. That argument must be rejected. Original 3 is a nullity and it has no scope in the context of any contention that it might be infringed. However, it must be considered in the context of any determination whether

reissue claims enlarge the scope of the claims of the original patent which they supersede. The determination question is whether a contested reissue claim is broader in scope than the apparent scope of the totality of the claims allowed in the original patent."

■ This Court holds that Claim 3 of the original Sarbo Patent must be considered in determining the scope of Reissue Claims 4 and 5. Upon such consideration the Court concludes that the scope of Reissue Claims 4 and 5 is narrower than the scope of the original claim and said claims are not invalid under 35 U.S.C.A. § 251 for failure to file the application within two years after the grant of the original Patent.

■ The Court concludes that Moretz's 2400 Series Foot Covers infringe Sarbo Reissue Patent Claims 4 and 5.

The Supreme Court sanctioned the following rule for establishing infringement in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), when Mr. Justice Jackson said:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

The evidence presented during the trial, including the demonstrations and the testimony of expert witnesses, indicates that the 2400 Series Foot Covers are virtually "Chinese Copies" of foot covers made by Wayne-Gossard and Renfro, as well as Russell Styles 1334A and 1334C found to be infringements of the original Sarbo Patent by Judge Gordon in the first Russell action.

The most serious contention of noninfringement offered by Moretz with respect to the 2400 Series is that the word "seam" in the claims must be read as "looped seam," and since the 2400 Series Foot Covers are closed across the bottom by an overedge seam rather than by looping there is no infringement.

The defendant cites and relies upon certain portions of the testimony of Edgar Sarbo, the inventor, at the first Russell trial as purporting to show that he conceived of his invention as having a looped bottom seam. The file wrapper of the original Sarbo Patent (DX 2), however, clearly demonstrates that, even though Sarbo may have preferred looping, he contemplated several different methods of seaming the bottom in his original conception of the invention.

The different methods of sewing or looping the bottom seam are reflected in both the Original and Reissue Patents and file wrappers. The specification, after describing how the surplus courses could be used to aid in closing the bottom seam, specifically sets forth alternative closure methods:

"By this seam 10 (closing seam, machine seam or the like), the foot cover is finished at its lower end and assumes a form which is pocket or bag-like." (PX 23 and 29.)

In the second Russell suit, the looping argument was made and rejected by both the trial and appellate courts. Judge Field in speaking for the Circuit Court (483 F.2d 770–773), stated:

"Russell seems to argue that the term 'seam' in the Sarbo claim means a 'looped seam' and that this is in some manner indispensible to the formation of a 'symmetrical pouch-like body' as embodied in the Reissue Patent. However, this contention finds no support in the record. In the original proceedings in the Patent Office, the attorney for Sarbo candidly stated that the stretchable seam may be formed by a method known *per se* on any number of existing machines. Additionally, we note that in the former litigation involving Claim 3 of the original Patent, the district court found that '[t]he sock of the Sarbo invention can be made on practically any type of circular hosiery machine and can be closed along the bottom by a conventional looping operation or

seamed with a straight machine seam by relatively unskilled personnel.' This finding went unchallenged by Russell and appears to have been accepted by this court upon the former appeal."

At the trial the defendant's expert witnesses stated upon cross-examination that the 2400 Series Foot Covers were "substantially symmetrical," and that when the term "seam" was used it brought to mind a number of equivalent methods of forming seams—among them looping and overedge seaming. Judge Merhige, the trial judge in the second Russell suit, found that the language of Claims 4 and 5, when viewed in light of their file wrapper history, does not limit the Sarbo foot cover to a looped seam and the resultant "exactly" symmetrical pouch-like body. He stated in his findings and conclusions, Page 8:

"The record reflects that where the type of seam is mentioned in the Sarbo specification, it was always referred to alternatively as to its type. The use of the phrase 'symmetrical pouch-like body,' as used in the Reissue Patent, was intended to distinguish foot covers of the type disclosed by Grey Patent No. 2,333,373 and others in which the foot cover has definite toe and heel portions and may and is intended as a practical matter to be worn in a non-reversible condition. As used in the Sarbo Reissue Patent, the phrase means that the ends are sufficiently alike within the framework of the stretchability built into the sock, so that either end can be conveniently worn as toe or heel without a significant difference in fitting quality, and serves to exclude from the scope of the patent those foot covers which have definite toe and heel portions."

This Court agrees with both Judges Field and Merhige that there is no requirement in the Sarbo Patent that the seam employed be a looped seam so as to automatically form a *precisely symmetrical pouch-like body*.

The Court concludes that Moretz's 22000 Series Foot Covers do not infringe Claims 4 and 5 of the Sarbo Reissue Patent.

■ The evidence shows and the court finds that the foot covers in the 22000 Series are knit with reciprocatory knitting to provide extra fabric to form a heel pouch in the body portion. The resulting foot cover does not have a "symmetrical pouch-like body" as that term is used in the Reissue Patent. This Court adopts the meaning given the phrase or term by Judge Merhige: " * * * was intended to distinguish foot covers of the type disclosed by Grey Patent No. 2,333,373 and others in which the foot cover has definite toe and heel portions and may and is intended as a practical matter to be worn in a non-reversible condition." The resulting foot cover does not have the same knitting structure throughout the axial length and periphery of the body because of the reciprocatory knitting. Judge Gordon reached the same conclusion when he excluded from the scope of the original Sarbo claims foot covers incorporating reciprocatory knitting, and Judge Merhige seemed to agree although this specific issue was not before him.

■ While the plaintiff is not estopped from urging infringement because it did not contend in prior litigation that certain Russell foot covers incorporating reciprocatory knitting infringed the Sarbo Patent, such evidence is before the Court and must be weighed against the plaintiff in this action.

The doctrine of intervening rights is an equitable remedy and was created by the courts long before it was codified by the Congress. In 1952 Congress enacted 35 U.S.C.A. § 252 which declares the effect of the reissuance of a patent. It is a restatement of the corresponding portion of the old statute as to the effect of reissue, and a codification of the case law relating to the protection of intervening rights upon reissue with certain variations. It therefore becomes necessary to consider the statute on its own terms rather than relying upon the prior case law in determining when and how the doctrine applies.

The first paragraph contains the restatement of the old statute as to the effect of reissue and specifically withholds intervening rights from infringers when the infringed claim of the reissue patent is identical to a claim in the original patent, which is not the case here, since the Court has found plaintiff's Reissue Claims 4 and 5 in suit to be narrower than their parent Claim 3 of the original Sarbo Patent.

The second paragraph of the statute contains two separate and distinct parts. The first part provides:

"No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. . . ."

This part of the paragraph grants the absolute right to the infringer of a reissue patent to "continue the use of, or to sell to others . . . the specific thing so made, purchased or used . . . prior to the grant of the reissue." This part of the statute has application here with respect to Moretz's foot covers made *prior* to the date of the reissue patent, but sold (or used) *after* the date of the reissue, and plaintiff makes no claim for damages with respect to the covers which fall in this category. By this part of the statute's own terms, it does not permit the further *making* of patented products. These conclusions are borne out by P. J. Federico's Commentary on the New Patent Act cited and relied upon by the

defendant, (35 U.S.C.A. § 1—Pages 45, 46 and 47), in the following language:

"The specific things made before the date of the reissue, which infringe the new reissue claims, are absolutely free of the reissued patent and may be used or sold after the date of the reissue without regard to the patent; in the language of the statute, the reissued patent shall not abridge or affect the right of any person 'to continue the use of, or to sell to others to be used or sold, the specific thing' made, used or purchased prior to the grant of the reissue. This absolute protection extends only to the specific objects actually made before the grant of the reissued patent and does not extend to the making of additional objects of identical or like kind."

The second part of the second paragraph provides:

"The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue."

It is clear that this portion of the paragraph permits the Court in its discretion to allow the continued manufacture, use and sale of items covered by the reissue patents "under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue," and it is this part of the statute which gives rise to the basic disagreement between the plaintiff and the defendant as to the application of the doctrine of intervening rights in this case. Stated simply, the heart of the disagreement centers around the proposition of whether or not this portion of the statute applies to narrowed reissues. The defendant contends that it does apply to narrowed reissues while the plaintiff argues that the doctrine applies only to broadened reissues. The cases are legion, both before and after the codification that the doctrine applies to broadened reissues but no case has been cited or found applying it to narrowed reissues. The defendant cites and relies upon a statement of Mr. Federico in his Commentary indicating that it applies to narrowed as well as broadened reissues.

The application of the doctrine of intervening rights to broadened reissues is apparent. A party who avoids infringement of a narrow original patent claim and invests substantial amounts of capital in good faith reliance on the narrow scope of the patent would be severely damaged if, through no fault of his own, he suddenly became an infringer of a broader reissue patent. Thus, under such circumstances, courts of equity have been inclined to balance the equities by applying the doctrine and permitting the infringement to continue on some limited basis.

Narrowed reissues, on the other hand, present an entirely different question, since the infringer will have necessarily infringed the broad original claim from the outset, if he, indeed, infringes the narrower reissue claim. Under these conditions the infringer commences his activities in the inequitable position of an infringer, and the patentee does nothing more in obtaining his narrowed reissue than dedicate into the public domain that scope of patent protection lying between the narrowed reissue claim and the broader original claim.

Based upon this clear distinction between broadened and narrowed reissues, scores of cases, prior to 1952, have repeatedly held that the doctrine of intervening rights does not apply to narrowed reissue patents. See, e. g. Babcock &

Wilcox Co. v. Springfield Boiler Co., 16 F.2d 964, 970 (2nd Cir. 1927); Ball & Roller Bearing Co. v. F. C. Sanford Mfg. Co., 297 F. 163, 165 (2nd Cir. 1924). Also see White v. Fafnir Bearing Co., 263 F.Supp. 788 (D.Conn.1966), where the court discussed the doctrine and Mr. Federico's interpretation of Section 252 but did not indicate acceptance of such interpretation. The court rejected the application of the doctrine on the merits of the case.

■ This Court is of the opinion that the doctrine of intervening rights would not apply here since Claims 4 and 5 of the Reissue Patent are narrower than Claim 3 of the original Patent. However, assuming *arguendo,* that the doctrine applies to narrower reissues as contended by the defendant, the Court concludes that Moretz is not entitled to the benefit of the doctrine on the merits of this case.

There is no evidence that the defendant was misled by the scope of the original Patent. All the prior opinions dealing with the original and Reissue Patents, as well as all evidence, clearly show that Sarbo never intended the original Patent to cover anything other than a shoe-top length foot cover to be worn with low-cut shoes, and never claimed that any product infringed the claims. The foot covers made by Moretz, Styles 2400, which infringed Claim 3 of the original Patent, are copies of plaintiff's own Sarbo foot covers, and they continued to be so until late 1972— three years after the Reissue Patent. In fact, one such style was being made by Moretz at the time of the trial. Moretz cannot claim that it was misled by the scope of the original Patent. The fact that the Reissue Patent trimmed the perimeters of the original claim is of no help to Moretz. It infringes the Reissue Patent just as clearly as it did the original Patent.

Moretz contends that substantial sums of money were expended to purchase additional knitting machines and to convert existing ones in order to manufacture these foot covers. The Court was given only estimates and was advised that such expenditures were over a period of from 1964 to the date the action was filed—1973. It is difficult to understand why some definite sums and dates could not be furnished as to the bigger items. The evidence discloses that the accused foot covers can be made on any circular knitting machine and require no special type machine. The same machine can be used to knit many different types of hose or socks. The defendant claims that it converted from the Sarbo type foot cover, its 2400 Series, to the 22000 Series, which require reciprocatory knitting for a heel pocket, after the decision in the second Russell case. This Court has determined that the 22000 Series do not infringe the Patent in question here. The evidence shows that substantial changes must be made in the circular knitting machines to do reciprocatory knitting. The question arises as to how much of the estimated expenditure was for this change over? Many other questions arise which are not answered by the evidence. The Court is of the opinion that, if the Congress intended the doctrine to apply to narrower reissues, the evidence does not justify its application here.

■ The defendant raised the question of lack of jurisdiction for failure to join indispensable parties, namely, Edgar G. Sarbo and Renfro Hosiery Mills, Inc., in a Motion to Dismiss which was heard and ruled on prior to the trial. The Court determined that Sarbo and Renfro were not indispensable parties to the maintenance of this action for the reasons set forth in a Memorandum of Decision dated June 20, 1974. After hearing all the evidence offered at the trial the Court is still of the opinion that they are not indispensable parties and affirms its prior decision. The findings and conclusions set forth in the Memorandum of June 20th are incorporated herein by reference and made a part and parcel of this decision.

All other defenses and contentions advanced by the defendant have been examined and found to be without merit.

By way of summary, the Court concludes:

1. Claims 4 and 5 of the Sarbo United States Reissue Patent No. 26,-667 are valid and enforceable.

2. Moretz's Foot Sock Styles 2444, 2445, 2446, 2447, 2448 and 2480 infringe Claims 4 and 5 of the Reissue Patent.

3. Moretz's Foot Sock Styles 2445, 2446, 2447 and 2480 infringe Claim 5 of the Reissue Patent.

4. Moretz's Foot Sock Styles 22444, 22445, 22447, 22448 and 22480 do not infringe Claims 4 and 5 of the Reissue Patent.

5. Wayne-Gossard is entitled to judgment enjoining Moretz from further infringement of Reissue Patent No. 26,-667, and to an accounting for damages for past infringement. Upon motion of the plaintiff a hearing in damages will be scheduled to determine the dollar value of such recovery.

Counsel for plaintiff will prepare and submit to the Court, with copy to counsel for the defendant for approval as to form, a judgment in accordance with these findings and conclusions.