**WAYNE–GOSSARD CORPORATION, Plaintiff,**

v.

**SONDRA, INC., Wedgewood Knitting Mills, and Liberty Hosiery Mills, Inc., Defendants.**

Civ. A. No. 74–288.

United States District Court, E. D. Pennsylvania.

June 29, 1977.

---

Charles B. Park, III, Bell, Seltzer, Park & Gibson, P.A., Joell T. Turner, Charlotte, N.C., Norma L. Shapiro, Dechert, Price & Rhoads, Harvey Bartle, III, Manuel W. Gottlieb, Philadelphia, Pa., of counsel, for plaintiff.

Henry N. Paul, Jr., Philadelphia, Pa., Morris Efron, Allentown, Pa., Leon H. Kline, Philadelphia, Pa., for defendants.

## MEMORANDUM OF DECISION

CLIFFORD SCOTT GREEN, District Judge.

The plaintiff, Wayne-Gossard Corporation, brings this civil action against the defendants claiming infringement of Claims 4 and 5 of plaintiff's reissue patent for a footsock or foot cover, and the method of manufacturing the same. Plaintiff seeks injunctive relief, and damages; also, counsel fees in regard to the issue of the validity of the patent. Defendants deny infringement and assert that the patent is invalid because of prior anticipation, obviousness and indefiniteness. Defendants also raise the defenses of intervening rights, laches and estoppel. Alternatively, defendants contend that any assessment of damages must be limited to damages arising from the date of the initiation of this lawsuit, the time they claim notice was first received.

The matter was heard before the Court without a jury, restricted to the issue of liability; the issue of damages being severed. After full consideration of the exhibits and testimony presented at trial, the briefs and arguments by counsel, the Court has decided that: 1) Claims 4 and 5 of the Sarbo reissue patent are valid; 2) said claims are infringed by defendants' Styles 40 and 50 footsocks; 3) the defenses of laches and estoppel have not been established; 4) the doctrine of intervening rights applies to narrowed reissue patents, but the evidence herein does not establish a basis for its application; 5) defendant received

notice of infringement of plaintiff's reissue patent on the date that the lawsuit was filed with the Clerk for the Eastern District of Pennsylvania and 6) this is not an exceptional case and accordingly plaintiff is not entitled to an award of reasonable attorney fees.

Pursuant to Rule 52 of Federal Rules of Civil Procedure, the Court makes the following Findings of Fact[1] and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Wayne-Gossard Corporation, is a corporation organized and existing under the laws of the State of Indiana, having its principal offices in Humboldt, County of Gibson, State of Tennessee.

2. Sondra Manufacturing Co., Inc. was originally incorporated in New Jersey on December 17, 1945. It succeeded to the business of Sondra Undergarments Company, a copartnership. On December 29, 1960 Sondra Manufacturing Co., Inc. was changed from a New Jersey corporation to a Pennsylvania corporation, and on January 18, 1973 the name was changed to Sondra, Inc. Defendant Sondra, Inc. has a regular place of business, including offices and manufacturing facilities, at Allentown, County of Lehigh, State of Pennsylvania. It also has an office in New York City, New York.

3. Defendant, Wedgewood Knitting Mills, Inc., is a corporation organized and existing under the laws of the State of Pennsylvania, having a regular and established place of business in Reading, County of Berks, State of Pennsylvania.

4. Defendant Intervenor, Liberty Hosiery Mills, Inc., is a corporation organized and existing under the laws of the State of North Carolina, having a regular and established place of business in Gibsonville, North Carolina.

5. U. S. Letters Patent No. 3,059,458 entitled Foot Cover and Method of Manufacturing the same were issued on October 23, 1962, to Bruder Sarbo of Vienna, Aus-

tria, upon application filed in the United States on November 12, 1959, by the named inventor, Edgar Gary Sarbo, claiming priority based upon an application filed in Austria on November 19, 1958.

6. The rights to the application for said Letters Patent No. 3,059,458 were assigned while the application was pending in the U.S. Patent Office by Edgar G. Sarbo to the firm Bruder Sarbo of Vienna, Austria, on or about October 28, 1959.

7. On or about December 2, 1964, all rights in said Letters Patent No. 3,059,458 were assigned by Bruder Sarbo to Renfro Hosiery Mills Company, a corporation organized and existing under the laws of the State of North Carolina, and having its principal place of business at Mt. Airy, County of Surrey, State of North Carolina.

8. On or about January 26, 1965, said Renfro Hosiery Mills Company assigned to May Hosiery Mills all rights in said Letters Patent No. 3,059,458 pursuant to an agreement between them dated December 22, 1964, whereby Renfro retained for itself a non-exclusive license to manufacture and sell products made in accordance with such patent.

9. On or about July 3, 1965, said May Hosiery Mills assigned all rights in said Letters Patent No. 3,059,458 to Wayne Knitting Mills pursuant to an agreement between said parties dated June 17, 1965.

10. On or about January 31, 1967, as a result of corporate merger, the name of Wayne Knitting Mills was changed to Wayne-Gossard Corporation and said Wayne-Gossard Corporation thereupon acquired all rights in said Letters Patent No. 3,059,458.

11. Sarbo U.S. Letters Patent No. 3,059,458 was the subject of prior litigation in the United States District Court for the Middle District of North Carolina entitled *Wayne Knitting Mills and May Corporation v. Russell Hosiery Mills, Inc. and Paul Russell,* 274 F.Supp. 934.

12. On September 29, 1967, the Honorable Eugene A. Gordon, United States Dis-

---

[1]. Findings of Fact numbers 1 through 72 are uncontested by either party. Both parties have stipulated to these facts and have agreed that said facts are to be taken as proven.

trict Judge, filed an Opinion, Findings of Fact and Conclusions of Law in the said action holding Claim 3, the only claim in issue, of said Original Letters Patent to be valid and infringed by defendant Russell Hosiery, and judgment was entered in the Court on October 18, 1967. [Reported at 274 F.Supp. 934.]

13. On September 10, 1968, the United States Court of Appeals for the Fourth Circuit reversed the decision of Judge Gordon and held invalid Claim 3 of said Original Sarbo Letters Patent for indefiniteness and overclaiming. [Reported at 400 F.2d 964.]

14. On November 12, 1968, Sarbo and Wayne-Gossard filed an application for reissue of the Sarbo patent which resulted in the issuance of the patent in suit, Reissue Patent No. RE 26,667, on September 23, 1969.

15. In the Sarbo Reissue Patent, Claim 3 of the original Sarbo Patent No. 3,059,458 was cancelled and new Claims 4 and 5 were added directed to the foot cover product.

16. During the prosecution of the application for reissue of the Sarbo patent there were filed in the United States Patent Office copies of the decisions of the District Court [274 F.Supp. 934] and the Court of Appeals [4th Cir., 400 F.2d 964] in the prior litigation, and of all of the prior art patents before the Courts during said litigation.

17. Wayne-Gossard is, and has been since such date of issuance, the owner of the entire right, title and interest in and to the Sarbo Reissue Patent in suit.

18. On October 31, 1969, Wayne-Gossard filed suit in the Middle District of North Carolina against Russell Hosiery Mills for infringement of the Sarbo U.S. Reissue Letters Patent RE 26,667.

19. On August 28, 1972, the Honorable Robert A. Merhige, United States District Judge of the Eastern District of Virginia, sitting by designation in the Middle District of North Carolina, held Claims 4 and 5 of the Sarbo Reissue patent to be infringed by Russell's styles 1331, 1333, and 1339.

20. On August 30, 1973, the Fourth Circuit Court of Appeals, affirmed the District Court's holding of infringement by Russell of the Sarbo Reissue Patent. [Reported at 483 F.2d 770.]

21. On October 3, 1973, Wayne-Gossard filed suit in the Western District of North Carolina against Moretz Hosiery Mills for infringement of the Sarbo U.S. Reissue Letters Patent RE 26,667.

22. On September 26, 1974, the Honorable Woodrow W. Jones, Chief United States District Judge, rendered a Memorandum of Decision holding Claims 4 and 5 of Sarbo Reissue Patent No. RE 26,667 valid, and holding that Moretz Hosiery Mills styles 2444, 2445, 2446, 2447, 2448 and 2480 infringed Claims 4 and 5 of the Sarbo Reissue Patent No. RE 26,667 [Reported at 384 F.Supp. 63].

23. Judgment in the Moretz suit was entered on November 4, 1974, whereupon Moretz took an appeal to the United States Court of Appeals for the Fourth Circuit. The decision was affirmed with regard to all issues except the conclusion of the trial court that the doctrine of intervening rights is not applicable to narrowed reissue patents. The case was reversed and remanded on the intervening rights issue.

24. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC 1974) (Finding of Fact No. 4) found that these new Claims 4 and 5 incorporate language which the Court of Appeals found to be lacking in the original Sarbo patent, 400 F.2d 967, disclosing how the patented device should be constructed so as to position the elasticized rim below the ankle in the place where it can perform its theretofore undiscovered—and hence new and novel—function. *Cf.,* Judge Merhige in *Wayne-Gossard v. Russell* (MDNC 1972) (P. 2).

25. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC 1974) (Findings of Fact No. 7), found that the product involved in the patent in suit is a knitted article of ladies' footwear designed to be worn on the foot without showing above the shoe. It is customarily worn without conventional hose or socks to give the "bare-legged" look. *Cf.,* Judge Merhige in *Wayne-Gossard v. Russell* (MDNC 1972) (Pp. 2, 3).

26. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC 1974) (Findings of Fact No. 7), found that prior to Sarbo's method and product in 1958, shoe-top-length footsocks were available in the market, but were made either from flat knitted fabric, which· was then cut and sewn into the desired shape and provided with a sewn-in elastic rim around the foot entry opening, or knitted as a regular sock having reciprocated heel and toe pockets, which would then be cut down at the top and provided with a sewn-in elastic rim around the foot entry opening. These shoe-top-length socks were not only comparatively expensive to manufacture, because of the cutting and sewing required, but also were rather uncomfortable to wear because of a heavy band or rim of elastic sewn around the foot opening which tended to burrow into the foot of the wearer due to pressure of the shoe.

27. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 7), found that sewing and cutting were time consuming operations requiring skilled operators and resulting in considerable waste.

28. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 7), found that the foot cover, as outlined in Claims 4 and 5 of the Sarbo Reissue patent, is. characterized by a seamless tubular elasticized rim adapted to form the foot entry opening with a seamless tubular body having a length greater than that of the rim and connected therewith. Such foot cover has a seam formed at the end of the body opposite the rim to form a symmetrical pouch-like body which can be adapted to function as tip, sole and heel portions and can be worn in reversed positions. The novel function of the foot cover is that the elasticized rim is positioned below the ankle in a foot hugging stretched condition and is completely concealed from view when worn with low-cut shoes. The foot cover has no definite toe and heel portions and can be conventionally worn in reversed positions upon the foot. The rim and the body, each, respectively, consists of the same knitting structure throughout its axial length throughout its entire periph-

ery. In summary, the finished product, as practiced by Wayne-Gossard, consists simply of a short length of circular knit, seamless, tubular fabric similar to that employed in making the top of seamless hose, having several courses of rubber laid in at what is to become the top of the foot cover, followed by a number of course of plain knit fabric, both of which are knitted on conventional circular knitting machines in a manner similar to conventional knitting of seamless hosiery. *Cf.,* Judge Merhige in *Wayne-Gossard v. Russell,* (MDMC1972) (P. 3).

29. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 7), found that in the practice of the invention by Wayne-Gossard and others, the footsock is knitted of stretch yarn, so as to have the capacity to stretch about a wide variety of foot sizes and conform to the lower portion of the foot which normally lies within the shoe.

30. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 7), found that the Sarbo footsock can be made on practically any type of circular knitting machine and can be closed along the bottom by a conventional looping operation or seamed with a straight machine seam by relatively unskilled persons. It does not require boarding or other shaping operations prior to marketing.

31. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 8), found that the Sarbo type foot cover has had tremendous commercial success and quickly became a staple item in the hosiery industry. The sales of this type of foot cover by Wayne-Gossard and Renfro alone amounted to more than 36 million pairs from 1965 to 1973.

32. Judge Jones, in *Wayne-Gossard v. Moretz,* 384 F.Supp. 63 (WDNC1974) (Findings of Fact No. 8), found that since the Sarbo Reissue patent was issued on September 23, 1969, Wayne-Gossard and Renfro have marked their packages containing foot covers made and sold by them with the number of Sarbo's Reissue patent—RE 26,-667.

33. Defendant Sondra began marketing its style 40 foot cover in substantial quantity about January 1966. The foot cover of Pl. Depo. Ex. 1, [PX 34] which has a stretchable rim with laid-in spandex thread, is representative of an initial marketing effort of defendant Sondra with respect to its style 40.

34. The foot cover of Pl. Depo. Ex. 13, [PX 46] which has a rim knit from nylon covered spandex yarn, is representative of Style 40, as modified and marketed by Sondra since January 1966.

35. Subsequent to September 23, 1969, the date of issuance of the reissue patent in suit, Defendant Sondra has (a) sold Style 40 foot covers [PX 46] manufactured after September 23, 1969, and (b) contracted with Defendants Wedgewood and Liberty to knit Style 40 foot covers.

36. Subsequent to September 23, 1969, none of the Style 40 foot covers sold by Defendant Sondra have been knit by Defendant Sondra itself, but rather, have been knit by others under contract with Defendant Sondra.

37. Subsequent to September 23, 1969, the date of the issuance of the reissue patent in suit, Defendant Wedgewood has manufactured and sold Style 40 foot covers to Defendant Sondra.

38. Subsequent to September 23, 1969, the date of issuance of the reissue patent in suit, Defendant Liberty has manufactured and sold Style 40 foot covers to Defendant Sondra.

39. During the period 1971–1973, Defendant Sondra also sold a Style 50 [PX 54] foot cover which was in all respects similar in construction to its Style 40, except that the body portion was knit with a so-called "micromesh" stitch.

40. As in the case of Style 40, since 1969, no Style 50 foot cover was knit by Sondra. Rather, such foot covers were knit by others under contract with Sondra.

41. In addition to Style 40 foot covers as such, Defendant Wedgewood has subsequent to September 23, 1969, also manufactured and sold to Defendant Sondra blanks for Style 40 foot covers (such as represented by Pl. Depo. Exs. 14A and 14B, PPX 47, 48) the finishing of which was accomplished by Sondra prior to Sondra's marketing same.

42. Packaging prior to marketing of all such Style 40 and Style 50 foot covers has been carried out at and by Sondra.

43. Sondra is the owner of U.S. Patent No. 3,600,909, entitled "Footlet Construction" and issued to Sondra's President, Morris Kaplan, on August 24, 1971, upon an application filed May 4, 1967.

44. Various advertisements and packages relating to Sondra Style 40 foot covers have, since August 24, 1971, borne the number of Sondra's Patent No. 3,600,909.

45. U.S. Patent No. 3,600,909 relates to Sondra Style 40 foot covers, as exemplified by Pl. Depo. Ex. 13 [PX 46].

46. For manufacturing Style 40 footsocks for Defendant Sondra, Defendant Wedgewood set up conventional machinery which it already had in its plant.

47. For manufacturing Style 40 footsocks for Defendant Sondra, Defendant Liberty set up conventional machinery which it already had in its plant.

48. Defendant Sondra, Inc., formerly known as Sondra Manufacturing Co., Inc., has been continually engaged in making and selling knitted footsocks for more than thirty years. These articles have been sold under various trademarks, including particularly "SOCK–EEZ" and "BOOT–EEZ". The trademark "SOCK–EEZ" was registered to Sondra for Knitted Foot Socks on October 11, 1960 under Reg. No. 705,620, claiming a use since September 1, 1942.

49. Defendant Sondra has made and sold numerous different styles of knitted footsocks and asserts that it has constantly sought to improve the same. For many years it was customary to provide such footsocks with the requisite extensibility and elasticity by sewing a rubber band or tape in the top portion thereof. This construction had the disadvantage of causing discomfort to the wearer either from lumpiness or gathering, or because of tension or binding.

50. In the period from about 1952 to 1959, following the development and intro-

duction of nylon yarn, many new synthetic textured yarns became commercially available which possessed stretch properties rendering them particularly suitable for end uses in knitted fabrics such as socks, stockings, sweaters, swim suits or the like. Among yarns which found use in such products was Helanca, a "stretch" yarn characterized by a high degree of yarn curl or crimp and capable of being substantially elongated.

51. Lycra, known in the early experimental stages as Fiber K, was introduced commercially on a limited scale in November 1959 from pilot plant production and from regular plant production in 1961. It has taken over large sections of the fiber and yarn market formerly held exclusively by rubber. It is here considered to be typical of the spandex group of fibers. Following introduction, Lycra spandex fibers and yarns were used successfully in all apparel and home furnishing applications for which rubber is suitable, with additional uses for which rubber is not suitable, that is, stretch fabrics of yarns spun from staple length Orlon and Lycra Fibers. Lycra and other spandex fibers have taken over a large share of rubber's traditional place in the foundation garment and brassiere industries. They are also being used for swimsuits and support hose and in elasticized fabrics designed to fit over contours of furniture, seats, etc.

52. An example of a knitted ladies' hose utilizing HELANCA yarn to provide extensibility is disclosed in Purcell patent No. 2,702,998, issued March 1, 1955, and an example of a footlet made of knitted fabric incorporating Helanca is disclosed in Goodman patent No. 2,848,885, issued August 26, 1958.

53. Examples of the use of a spandex or elastomeric yarn in the knitwear industry are described in the article appearing in Knitted Outerwear Times, issue of May 5, 1958, which relates to the Du Pont yarn which was first known as FIBER K and later became known as LYCRA.

54. In the period 1964–65 Sondra was engaged in developmental work and made and first endeavored to sell a foot sock known as Style No. 40. This was a seamless tubular foot sock having at one end a rim portion of single thickness forming an opening for foot entry and in which was incorporated a yarn having elastic properties to provide the requisite extensibility and having its opposite end closed by a seam. Defendants contend that sale of this sock was unsuccessful for the reason that the fabric was coarse and stiff and that the top tended to curl over.

55. Sondra received a letter, dated October 28, 1964, [DX 9] from an attorney representing a predecessor of plaintiff, namely, May Hosiery Mills, stating that that company was the owner of an application pending in the United States Patent Office and that the foot socks manufactured or contemplated to be manufactured by Sondra were deemed to be "an infringement of our client's rights, including the patent expected to issue thereon."

56. The patent application referred to in the abovementioned letter as pending in the United States Patent Office (application of Charles T. Smith, Serial No. 314,057, filed October 4, 1963) was thereafter rejected and abandoned after May Hosiery Mills acquired Sarbo patent No. 3,059,458.

57. May Hosiery Mills did not inform Sondra concerning its abandonment of the Smith application, but by letter of March 24, 1965 from its attorney, David H. Semmes, Esq., to Neisner Bros., a customer of Sondra, it stated that it owned the Sarbo patent No. 3,059,458 and the foot covers sold by Neisner were deemed to infringe the same.

58. Upon learning of the aforementioned infringement notice sent to its customer, Neisner Bros., defendant Sondra sought and obtained an opinion regarding Sarbo patent No. 3,059,458 from its patent attorney, Harry Price, Esq., of New York City, who is now deceased.

59. In a letter to Sondra, dated March 30, 1965, Mr. Price advised that he had conferred in Washington on March 26, 1965 with David H. Semmes, Esq. and had discussed the Sarbo patent with him. He characterized the claim of infringement as "without merit and baseless."

60. Sometime between March 26, 1965 and April 23, 1965, Harry Price advised Mr. Shepard Schwartz, then President of May Hosiery Mills, that Sondra was not interested in any further negotiation.[2]

61. Mr. Price on April 23, 1965 sought from Mr. Semmes an extension of time within which to submit a report. On the same day, Mr. Semmes wrote to Mr. Price, "If we do not hear from you by May 7, 1965, we are proceeding."

62. Following the receipt of a letter, dated 1/28/67 from Mr. Schwartz of May Hosiery, Mr. Price advised Sondra that he had investigated the Decision of the United States District Court for the Middle District of North Carolina (Judge Gordon). Referring to the proceedings and the evidence introduced at the trial (this being the suit filed by *Wayne Knitting Mills and The May Corporation against Russell Hosiery* in 1965), as well as the findings of Judge Gordon, Mr. Price stated that "it would clearly appear that the Sondra socklet would be outside of the scope of the Claim 3 of the patent, which was the only claim adjudicated."

63. Sondra received a letter dated November 28, 1967, copies of which were sent to various mills, from Mr. Schwartz of May Hosiery Mills, advising that a decision had been rendered by the United States District Court for the Middle District of North Carolina adjudging the original Sarbo patent to be valid.

64. On December 6, 1967, Mr. Price wrote to Mr. Schwartz, "My client, Sondra Manufacturing Co., Inc., has avoided the subject matter of the footsocks set forth in Pat. 3,059,458 since our discussion some years ago when you brought suit in North Carolina.[3]

65. No further communication took place between May Hosiery Mills or the owners of the Sarbo patent, and Sondra, charging infringement of that patent.

66. Commencing about January 1, 1966, Sondra began manufacturing and selling footsocks, designated as its Style 40, which were constructed according to the drawings of Morris Kaplan patent No. 3,600,909. The knitted tubular blanks for such footsocks were first made under contract by Stowe Hosiery Mills of Stowe, Pennsylvania. For the most part the Stowe socks were seamed, dyed, inspected and packaged by Sondra at Allentown, Pennsylvania.

67. In 1968 Sondra discontinued its "Sock-eez" brand of Style 40 footsocks and thereafter concentrated its branded sales of Style 40 under the "Boot-eez" brand. Sondra sold its Style 40 footsocks under customer brands from 1965 onward.

68. In the suit of *Wayne-Gossard Corporation v. Russell Hosiery Mills, Inc.*, based on Sarbo reissue patent RE 26,667, Russell defended on the ground of non-infringement. It did not challenge the validity of the Sarbo reissue patent.

69. Sondra's footsocks known as Styles 40 and 50 [PX 46, 54], these being the only foot socks sold by Sondra having the form of a seamless knitted tube closed at one end, have since January 1, 1966 been made in whole or in part by and under contract with other mills, including Stowe Hosiery Mills and defendants Wedgewood Knitting Mills and Liberty Hosiery Mills. All of these manufacturers have made Style 40 footsocks, or materials therefor, and Wedgewood Knitting Mills has made Style 50 footsocks, or materials therefor for Sondra and allegedly for no other purpose than for resale by Sondra.

70. Except for the Style 40 foot socks manufactured for Sondra by Liberty Hosiery Mills, all Style 40 and Style 50 footsocks sold by Sondra have been made with a rim portion constructed in the manner illustrated in Morris Kaplan patent No. 3,600,-909, said rim portion comprising a turned welt formed of knitted loops made entirely of Lycra or a similar spandex yarn. The Style 50 footsocks knitted for Sondra by Wedgewood Knitting Mills have been constructed in a manner similar to the Style 40 footsocks but have a body portion knitted with a so-called "micromesh stitch". This style was sold only in the years 1971–1973.

---

2. Transcript at 126, 131.

3. Plaintiff's exhibit 66.

71. The Style 40 footsocks manufactured for Sondra by Liberty Hosiery Mills have all been made with a rim portion comprising a turned welt formed of knitted loops of a stretch nylon yarn, which rim portion has in every eighth course a covered spandex yarn knitted in with a stretch nylon yarn.

72. All of the footsocks of Russell Hosiery Mills and Moretz Hosiery Mills which were accused or found by the courts to infringe the Sarbo original or reissue patent in the previous litigation based thereon involved the use of laid-in elastic threads in the rim portions thereof.[4]

73. The prior art relied upon by defendants in this action has either been considered, or is no more pertinent than other prior art which has been considered by the Patent Office and the various courts in connection with the prosecution and litigation involving the Sarbo patent.

74. The Sondra Style 40 and 50 foot covers correspond in the following respects to the language of claims 4 and 5 of the Sarbo reissue patent. These foot cover styles are characterized by being extremely elastic and extensible for being fitted in a highly stretched condition upon the asymmetrical configuration of the lower part of the foot of a wearer with the foot cover being of such height as to be positioned below the ankle in foot hugging, stretched condition, completely concealed from view when worn within lowcut shoes. The foot covers comprise:

a. A seamless stretchable tubular rim including at least some rubber threads—said rim being adapted to form an opening for a foot entry,

b. A seamless stretchable tubular body having an axial length greater than that of said rim and connected with said rim,

c. A seam found at the end of said body opposite said rim,

d. The body of the foot cover is adapted to function as tip, sole and heel portions of the foot cover, and

e. Upon placing the foot cover on the lower part of a foot, the attendant stretching of the foot cover reduces the combined axial length of the rim and the body and the foot cover fits over and hugs on the lower portion of the foot with the rim positioned on the asymmetrical portion of the foot below the ankle.

f. The combined axial length of the rim and body portions of the finished foot covers is within the range of about 5 to 7 centimeters.

g. While the Sondra footsocks use combinations of plain stitches and float stitches, the accused footsocks essentially consist of the same knitted structure throughout its axial length.

75. Spandex thread is a synthetic rubber or rubber-like material, and is, in fact, rubber in the sense that the term "rubber" is used in claims 4 and 5 of the Sarbo reissue patent.

76. There are three types of Sondra footsocks in issue herein—the regular Style 40,[5] Style 50,[6] and Liberty style. 40[7]. The regular Styles 40 and 50 have rims which are knit entirely of covered spandex yarn. The covered spandex yarn forming the knitted stitches of the regular Styles 40 and 50 rims is composed of 1) a rubber-like raw spandex thread core (about 20%), and 2) a covering of nylon threads coiled around the spandex core (about 80%). The coiled nylon threads would remain in the form of stitches forming the rim of the foot cover even if the spandex threads were removed from the rims.[8]

4. The parties have submitted to the Court Proposed Findings of Fact on which there is no agreement. In making Findings of Fact 73 through 95, we have considered the proposed findings of both parties, and have in some instances incorporated said findings. To the extent that a proposed finding of fact has not been incorporated into the Findings of Fact which follow, the proposed findings have been denied as against the weight of the evidence, denied as stated or denied as irrelevant to the issues herein.

5. Plaintiff's exhibit 46.

6. Plaintiff's exhibit 54.

7. Plaintiff's exhibits 56 and 64.

8. Plaintiff's exhibit 75, Shefte and Burns testimony.

The same type of spandex yarn is used in the Liberty Style 40 footsock. But Liberty incorporated the spandex by knitting it in with stretch nylon in every eighth course of the 64 knitted courses forming the rim. The remaining 56 courses of the Liberty rim are knit only with stretch nylon.[9]

77. References are made in the litigation against Russell Hosiery Mills to the Sarbo patent including a rim with rubber threads laid in. Such references were made by Sarbo's attorney in the District Court, the Court of Appeals and in a petition for a Writ of Certiorari to the Supreme Court of the United States, 393 U.S. 1064, 89 S.Ct. 717, 21 L.Ed.2d 707. The opinions of the District Court and of the Court of Appeals judges in the *Russell Hosiery Mills* cases accordingly make similar references to the laid-in rubber rim. When plaintiff's attorney's remarks and the opinions of the courts are considered in context, we find that neither counsel for plaintiff nor the courts considered laid-in rubber as a critical part of the invention as distinguished from incorporation by other methods, including the knit-in method.

78. The laying-in method was not the only method of incorporation contemplated by the original patent. The Sondra knit-in spandex rim and the Sarbo laid-in rubber rim are equivalents, and such equivalency for incorporating rubber was known and clearly established in the knitting art prior to the time of the Sarbo invention.

79. Prior teachings of both laid-in and knit-in rubber were before the Courts and both patent examiners, and the file wrapper of the original Sarbo patent indicates the equivalency between laid-in and knit-in rubber was contemplated. On page 13 of the original Sarbo patent file wrapper, Sarbo's attorney said [10]

. . . [I]t is pointed out that the rubber threads 5 are incorporated or knitted into the rim portion. This incorporation or knitting of the rubber threads 5 into the rim is carried out with a known machine according to any known method.

80. The knit-in spandex yarns in the accused Sondra footsocks serve the same function as the laid-in rubber yarns in the Sarbo rim—to contract the stitches in a coursewise direction.

81. The knit-in spandex yarn rims of the accused Sondra footsocks produce the same result as the laid-in rubber rim of the Sarbo footsock—they conform the symmetrical pouch-like body of the sock to the irregular configuration of the lower asymmetrical portion of the foot and maintain the body of the foot cover on the foot in tensioned condition.[11]

82. Plaintiff gave no notice of infringement of the Sarbo reissue patent to defendants until the date of the filing of this lawsuit. Neither the plaintiff nor any persons making or selling articles under the Sarbo reissue patent RE 26,667 have given notice to the public that the article is patented by fixing thereon the word "patent" or the word "pat." together with the number of the patent. However, the reissue patent number is printed on the package containing said articles.

83. The Sarbo reissue patent is a narrowed reissue. Sondra, Inc. never relied upon the defect in original claim 3 in pursuing the commercialization of its Style 40 from 1965 to the date the patent was reissued in September of 1969.[12]

84. There were no substantial expenditures by Sondra on sewing machines, inspection forms and tables between the time that the Style 40 footsocks were commercialized and the reissue patent was granted.[13]

85. The investment expended by Sondra in the 1965 to 1969 period in manufacturing

9. Defendant's exhibit 72; Shefte testimony; Isley testimony, transcript at 232–3.

10. Plaintiff's exhibit 3.

11. Shefte testimony.

12. Defendants' exhibits 81, 82, 83 Kudlow testimony, transcript at 525–534.

13. At final argument, defendants' attorney said, "Now, I won't go into the matter of artwork, the matter of sewing machines, the matter of inspection apparatus and all that because the sums there involved are relatively small." Transcript at 1077.

and promoting its Style 40 is negligible in comparison with the profits Sondra has received. Because of the defect in the original Sarbo patent, Sondra has no infringement liability for its production prior to September 23, 1969, and plaintiff makes no claim regarding the period prior to the reissue.

86. Since Reissue Patent RE 26,667 was issued on September 23, 1969, Wayne-Gossard and Renfro have marked their packages containing foot covers made and sold by them with the Sarbo Reissue Patent No. RE 26,667.[14]

87. Sondra marked the packages containing its Style 40 footsocks with the Kaplan patent number, 3,600,909. Sondra admits that it would have been too expensive to mark the Socks themselves with the patent number via the "transfer process."[15]

88. Since the issuance of the patent in suit on September 23, 1969, and prior to commencement of this action in February, 1974, plaintiff was substantially continuously engaged in litigation against other defendants, seeking successfully to have said patent sustained as valid and infringed. To the extent that such litigation effort resulted in a delay in plaintiff's asserting its rights under this patent against defendants, such delay was reasonable and was not prejudicial to defendants.

89. Morris Kaplan, President of Sondra, in an effort to improve upon previously made foot socks in which rubber bands or tapes were incorporated in the tops thereof, developed the footsock construction illustrated and described in United States Patent No. 3,600,909 in which the top portion of the sock comprises a double thickness welt composed of loops knitted entirely of a covered Lycra yarn.

90. The footsocks which are herein accused to infringe the Sarbo reissue patent have been sold by Sondra without interruption and in increasing quantities since 1965, necessitating some expenditures for expansion of space and facilities.

91. Since on or before January 1, 1966, Sondra has advertised its Style 40 footsocks and other footsocks in its manufacturing line. Said advertisements contained the notation, "Patent pending" or stated the Kaplan patent number 3,600,909.

92. The Sarbo reissue patent specification states, *inter alia,* that, "This rubber thread is inserted (e. g., laid-in) in the manner of a woven fabric . . . such that the rubber thread lies substantially along the periphery of the rim and transversely of the knitting direction . . ."

93. The descriptive portion of the specification of the original Sarbo patent No. 3,059,458 makes no mention of a shoe or of any relationship between the height of the foot cover and the top of a shoe, or to the ankle of the wearer, or to concealment of a foot cover within a shoe.

94. Neither the original Sarbo patent No. 3,059,458, nor the reissue thereof RE 26,667, contain an illustration, definition or description of a "low cut shoe."

95. Claims 4 and 5 of the Sarbo reissue patent are valid and are infringed by the Sondra footsocks Styles 40 and 50. The defenses of laches and estoppel are not established.

## CONCLUSIONS OF LAW

1. The jurisdiction of this Court arises under Title 28, United States Code § 1338(a).

2. The venue of this action is in the Eastern District of Pennsylvania under Title 28, United States Code, § 1400(b), and all defendants admit that venue is proper.

3. Claims 4 and 5 of U.S. Reissue Patent No. RE 26,667 are presumed valid pursuant to Title 35, United States Code § 282. Defendant has not carried its burden of establishing invalidity of the Sarbo reissue patent. Therefore, the Sarbo reissue patent is valid.

4. The Sondra Styles 40 and 50 footsocks fall within the words of claims 4 and 5 of the Sarbo reissue patent, and the Style

---

14. Plaintiff's exhibits 7, 27, 28. Merritt's testimony, transcript at 39–40; Schwartz testimony, transcript at 94–95, 107–108.

15. Fels' testimony, transcript at 654.

40 and 50 footsocks infringe the Sarbo reissue patent.

■ 5. The doctrine of intervening rights applies to narrowing reissue patents as well as broadening reissue patents. The doctrine is to be applied to protect the continued manufacture, use or sale of a product when substantial preparation for such continuance is made before the grant of the reissue. The extent of the application of the doctrine is within the discretion of the Court. Title 35 United States Code § 252.

6. Title 35 United States Code § 287 provides,

> Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice. (July 19, 1952, c. 950, § 1, 66 Stat. 813.)

Since the Wayne-Gossard Corporation did not comply with the constructive notice provisions of § 287, defendants are deemed to have notice of infringement as of February 5, 1974, the date that the complaint was filed in this action.

7. Wayne-Gossard Corporation is entitled to an order enjoining Sondra, Wedgewood and Liberty from further infringement of Reissue Patent No. RE 26,667. Title 35 United States Code § 283.

8. Wayne-Gossard Corporation is entitled to damages from Sondra adequate to compensate it for infringement since February 5, 1974, when Sondra was given notice of infringement by the filing of the instant lawsuit. Title 35 United States Code § 284.

9. Wayne-Gossard Corporation is entitled to interests and costs as hereafter fixed by the Court. Title 35 United States Code § 284.

10. Wedgewood Knitting Mills and Liberty Hosiery Mills are not liable to Wayne-Gossard Corporation for damages, since both companies had stopped their manufacturing of the Sondra footsocks by February 5, 1974, the date of the notice of infringement. Title 35 United States Code § 287.

11. Wayne-Gossard Corporation is not entitled to any increase in damages as provided for in Title 35 United States Code § 284.

12. This is not exceptional case as defined in Title 35 United States Code § 285, and Wayne-Gossard Corporation is not entitled to an award of reasonable attorney fees.

## DISCUSSION

In *Wayne Knitting Mills v. Russell Hosiery Mills,* 400 F.2d 964 (4th Cir. 1968), Judge Winter held Claim 3 of the original Sarbo patent invalid as ". . . so broad that it claim[ed] as invention that which plaintiffs concede[d] was not new." *Id.* at 968. The problem with the patent was that it,

> [l]acke[d] language disclosing how the patented device should be constructed so as to position the elasticized rim below the ankle in the place where it can perform its theretofore undiscovered—and hence new and novel—function . . .

The court also held that since the patent failed ". . . to specify the critical location of the laid-in-rubber rim the claim of the patent is invalid for failure to satisfy 35 U.S.C. § 112." Section 112 provides, *inter alia* that

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Pursuant to 35 U.S.C. § 251, plaintiff and Sarbo applied to the U.S. Patent Office for

a reissue of the original Sarbo patent. The reissue patent, which was granted to Wayne-Gossard and the original patentee on September 23, 1969, cancelled the original Claim 3 and added new Claims 4 and 5.

Claim 4 is essentially Claim 3 with the incorporation of language which meets the criticism of the Fourth Circuit. Claim 4 describes the patented article as:

> A knitted foot cover characterized by being extremely elastic and extensible for being fitted in a highly stretched condition upon the asymmetrical configuration of the lower part of the foot of a wearer with the foot cover being of such height as to be positioned below the ankle in foothugging, stretched condition, completely concealed from view when worn within low cut shoes, said foot cover comprising a seamless, stretchable tubular rim including at least some rubber threads, said rim being adapted to form an opening for a foot entry, a seamless stretchable tubular body having an axial length greater than that of said rim and connected with said rim, said rim and said body, each, respectively consisting of the same knitting structure throughout its axial length and throughout its entire periphery, and a seam formed at the end of said body opposite said rim to form a symmetrical pouchlike body, and said body being adapted to function as tip, sole and heel portions of said foot cover, whereby upon placing the footcover on the lower part of a foot, the attendant stretching of the foot cover reduces the combined axial length of said rim and said body and the foot cover fits over and hugs only the lower portion of the foot with said rim positioned on the asymmetrical portion of the foot below the ankle.

Claim 5 is essentially Claim 4 with the addition of the following language: " . . . the combined axial length of said rim and said body being about 5 to 7 centimeters . . . ."

The validity of Claims 4 and 5 has been sustained in direct challenges thereto in *Wayne-Gossard Corporation v. Moretz Ho-* *siery Mills,* 384 F.Supp. 63 (W.D.N.C.1974), aff'd, C.A. 75–1240, 539 F.2d 986 (4th Cir. 1976). Validity of the claims has been indirectly sustained in *Wayne-Gossard Corporation v. Russell Hosiery Mills,* C.A. 223–R–69 (M.D.N.C.1972), aff'd, 483 F.2d 770 (4th Cir. 1973).

## I. VALIDITY

■ Pursuant to 35 U.S.C. § 282,[16] a patent is presumed valid, and the burden of establishing the invalidity of the patent is on the party asserting the invalidity. Defendant argues that plaintiff's invention is not validly patented because of obviousness and anticipation by the prior art. Defendant also argues that the reissue patent is invalid because of the inclusion of new matter.

Title 35 § 103 provides, *inter alia,*

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains
>
> . . .

July 19, 1952, c. 950, § 1, 66 Stat. 798. In *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court delineated the criteria for a judicial determination of obviousness. The mandatory criteria are determinations of " . . . the scope and content of the prior art . . . ; differences between the prior art and the claims at issue . . . ; and the level of ordinary skill in the pertinent art . . . ." *Id.* at 17, 86 S.Ct. at 694. The court may also secondarily consider such elements as, " . . . commercial success, long felt but unsolved needs, failure of others, etc. . . . ." *Id.*

■ Most of the prior art which defendants claim had already disclosed the function of plaintiff's patent was considered by

---

**16.** Title 35, § 282 provides, inter alia, "A patent shall be presumed valid. The burden of estab- lishing invalidity of a patent shall rest on a party asserting it . . . ."

the U.S. Patent Office in the Sarbo reissue patent.[17] Defendants also rely on two patents—the Lepper Patent No. 832,550 [DX22A] and the Goodman patent No. 2,848,885 [DX28A]—which were not considered by the Patent Office.

Defendants argue that the Lepper patent proves that it was old in the art to make "integrally knit" footsocks made of "thin elastic material" which hug the asymmetrical part of the foot below the ankle. They argue that the Goodman patent shows that it was old in the art to provide a footsock with a marginal edge or rim having a knit-in elastic thread situated below the ankle of the wearer. We have examined both of these patents, and the Sarbo reissue patent does not come within the specifications of either. The basic forms of the Lepper and Goodman footsocks differ substantially from the Sarbo footsock.

The illustrations of the Lepper and Goodman patents indicate that they fit below the ankle of the wearer. But neither footsock fits in any way which approaches the manner of fit of the Sarbo footsock. Thus there was no need for the Patent Office to consider these patents in reissuing the Sarbo patent, because neither were or are pertinent. The claims asserted by the Sarbo reissue patent have not been previously disclosed by another patent.

The Sarbo footsock differs from most of the prior art, which is made up primarily of cut-and-sewn footsocks. The cut-and-sewn footsocks were more expensive and difficult to manufacture, and the Sarbo-type footsocks fit much better. Sondra had been a manufacturer of cut-and-sewn footsocks for many years, and did not begin making the Sarbo-type footsocks until some six years after the Sarbo invention.[18] Thus, the scope and content of the prior art did not embrace the Sarbo-type footsock, and the level of ordinary skill in the art was not such that the Sarbo-type footsock was obvious.

The primary difference between the Sarbo footsock and the prior art is that this was the first low cut footsock which was not cut-and-sewn, but which nonetheless could be held on the foot.

It is clear that until the Sarbo footsock, there had been a great demand for a sock which could be concealed in a low-cut shoe. There was also a search by a number of manufacturers including Sondra, for such a sock. Sondra had tremendous commercial success with its Style 40 and 50 footsocks once the line was established. This commercial success is further evidence of validity.

The elements in this patent have been combined to perform a new and different function. In making its determination regarding obviousness, the Court,

. . . should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. . . ."

*Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976).

In line with the standard enunciated in *Sakraida,* we have considered the prior pertinent art and the extensive testimony of plaintiff's expert, Dalbert U. Shefte and defendants' expert, Robert E. Burns. On the basis of our examination of the prior art and our crediting the analysis of plaintiff's expert regarding the scope of the prior art, differences between the prior art and the claims at issue and the level of ordinary skill in the pertinent art, we determine that the differences between the Sarbo patent and the prior art are of such substantiality that the subject matter of the Sarbo patent would not have been obvious in October of 1962 (when the original patent was issued)

---

17. The following patents, relied on by defendants to show obviousness because of the prior art, are referred to in the Sarbo File Wrapper Reissue 26,667: 1) The Teichman German patent at pages 17, 114–120; 2) the Teichman Swiss patent at pages 17, 128–135; 3) the Herbert patent No. 2,344,773 at pages 16, 47–51.

18. Transcript at 993.

to a person of ordinary skill in the art of manufacturing footsocks.[19]

Defendant also argues that the patent is invalid because the original Sarbo patent contained no reference to concealment in the shoe and the anatomy of the foot. Defendant contends that the addition regarding the concealment in the shoe is new matter and in violation of 35 U.S.C. § 251 which provides, *inter alia,* "No new matter shall be introduced into the application for reissue."

New matter is new and substantive information which might change the invention. It is information also which would be more properly presented in a new patent application. *Siebert Cylinder Oil Cup Co. v. Harper Lubricator Co.,* 4 F. 328 (C.C.1880); *Powder Co. v. Powder Works,* 98 U.S. 126, 25 L.Ed. 77; *Chore-Time Equipment, Inc. v. Automatic Poultry Feeder Co.,* 239 F.Supp. 341 (W.D.Mich.1965). The addition of the information regarding the positioning of the footsock on the foot and within the shoe does not change the invention patented in the original Sarbo patent. And this information would not have been more appropriately presented in a new patent application.

Defendants admit that Figure 5 of the original patent shows a footsock on a foot which meets the description allowed in the reissue patent, but argue that reliance on a drawing for information not noted in the original specifications does not prevent the information from being impermissible new matter.

In *United States Industrial Chemicals Co. v. Carbide Corp.,* 315 U.S. 668, 676, 62 S.Ct. 839, 843, 86 L.Ed.2d 1105 (1942), the Supreme Court said,

. . . If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee

that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough than an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original.

The mere showing of an element of an invention in the illustrations of the original patent will not establish that said element was intended to be claimed in the original patent. However, the illustrations provide some evidence that what is covered by the reissue patent was intended to be covered and secured by the original patent. See also, *Nachtman v. Jones & Laughlin Steel Corp.,* 134 F.Supp. 392 (W.D.Pa.1955), aff'd., 235 F.2d 211 (3rd Cir. 1956) cert. denied, 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324 (1957).

In both *United States Industrial Chemicals Co.* and *Nachtman* which was cited by defendants in support of their position, different combinations of elements were claimed in the reissue patents. The Sarbo reissue patent does not contain any new elements or combinations of elements; it contains only an elaboration of how the combination of elements disclosed in the original patent perform what Sarbo claims is the new and novel function of the footsock. The information which was added in the Sarbo patent is descriptive, and narrows substantially what is claimed by Sarbo.

In *Weller Manufacturing Company v. Wen Products, Inc.,* 231 F.2d 795 (7th Cir. 1956), defendants contended, as here, that a reissue patent was invalid due to the inclusion of new matter. The Court said,

Obviously, a patentee is not forbidden to add as new material in a reissue patent a description of the inherent function and

---

**19.** In *Universal Athletic Sales Co. v. American Gym Recreational & Athletic Equipment Corp., Inc. et al.,* 546 F.2d 530 at 542, (3rd Cir. 1976), Judge Adams said ". . . In the absence of expert testimony, other than that of Mr. Lyle, the trial judge could not properly appraise the prior art, narrow in scope as it was . . .

[T]here may be instances where a trial court may be able to review prior art references without expert assistance . . ." We believe that the expert testimony of both parties was necessary for our proper appraisal of the prior art.

mode of operation disclosed in the original patent. *Id.* at 799.

The Court continued that,

> Furthermore, we are of the opinion that an applicant for reissue may fully describe his original invention and include in his new description and claims not only what was described before, but also what was suggested or implied in the original drawings, specifications and models. *Id.* at 800.

Cf. *Maxant Button & Supply Co. v. Sears, Roebuck & Co.*, 388 F.2d 912, 917 (7th Cir. 1968); *Bendix Corporation v. Balax, Inc.*, 421 F.2d 809, 817 (7th Cir. 1970).[20]

The addition of the information regarding the location of the footsock on the foot and within the shoe is not new and substantive information which changes the footsock patented originally. It simply specifically describes the form and function of the footsock as illustrated in Figure 5 of the original patent. This information complies with the directive of the Fourth Circuit, and cures the defects which compelled the finding of invalidity. This information is not "new matter" within the meaning of 35 U.S.C. § 251, and the patent is not invalid because of the inclusion of new matter.

Finally, our analysis of the evidence requires us to note that Claims 4 and 5 of the Sarbo reissue patent have been upheld in the Fourth Circuit in *Wayne-Gossard Corporation v. Moretz Hosiery Mills, Inc.*, 384 F.Supp. 63 (W.D.N.C.1974), affirmed, No. 75–1240, 539 F.2d 986 (4th Cir. 1976). The findings of validity of these courts are not binding on this court, but they are, " . . . to be considered as strongly persuasive in the absence of any convincing new evidence of invalidity." *American Photocopy Equipment Co. v. Rovico, Inc.*, 257 F.Supp. 192, 194 (N.D.Ill.1966); *King-Seeley Thermos Co. v. Millersville Manufacturing Co.*, 296 F.Supp. 247, 249 (M.D.Tenn.1968), aff'd., 412 F.2d 318 (6th Cir. 1969). No such new evidence has been presented. Accordingly, we find that Claims 4 and 5 of the Sarbo reissue patent are valid.

## II. INFRINGEMENT

■ Sondra's Style 40 (Plaintiff's Exhibits 46, 47, 54) and Style 50 (Plaintiff's Exhibits 54, 54A) footsocks are accused of infringing plaintiff's reissue patent. Defendant Wedgewood manufactured some of the accused Style 40 footsocks and defendant Liberty manufactured two types of footsocks (Plaintiff's Exhibits 55, 56) for which Sondra is accused of infringing.

Defendants argue that even if we find the patent valid, their products do not infringe the Sarbo reissue patent. Their position is that they are not using Sarbo's contribution to the art as previously determined by the courts and previously defined by plaintiff. Defendants' characterization of Sarbo's contribution to the art is crucial to their position.

Defendants contend that laid-in rubber as used in the Wayne-Gossard footsock functions differently than the knit-in rubber used by defendants. They argue that the knit-in rubber with the turned over welt does not curl at the top as does the laid-in rubber. They argue also that the laid-in rubber forms beads on the inner rim which indent the flesh and have a functional effect of holding the sock in place in a different manner.

Additionally, defendants contend that the use of laid-in rubber was positively claimed by plaintiff in the Sarbo patents and that the laid-in rubber rim was one of the new and novel elements of the Sarbo patent. Defendants claim non-infringement, arguing that the Sarbo patent is limited to laid-in rubber rims. In support of their position, defendants cite the briefs and arguments of plaintiff in previous litigation involving the Sarbo patent which defendants suggest are admissions with regard to defendants' position.

Defendants point to the references to laid-in rubber in the trial and appellate

---

**20.** See also, *Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co.*, 169 F.Supp. 1 (E.D.Pa. 1958), where Steel, J. held that, "The action of the Patent Office in permitting the amendment constituted an implicit determination that no 'new matter' was included in it." *Id.* at 21.

court decisions by Judges Gordon and Winter in *Wayne Knitting Mills v. Russell Hosiery Mills*, 274 F.Supp. 934 (M.D.N.C.1967), reversed, 400 F.2d 964 (4th Cir. 1968), as an indication that the critical feature or the novelty of the invention is the laid-in rubber rim.

Defendants argue that in the subsequent *Russell* cases, C–223–R–69 (M.D.N.C. August 28, 1972), affirmed, 483 F.2d 770 (4th Cir. 1973) and in *Wayne-Gossard Corp. v. Moretz Hosiery Mills, Inc.*, 384 F.Supp. 63 (W.D.N.C.1974), affirmed, No. 75–1240 (4th Cir. March 15, 1976) the courts implicitly accepted Judge Gordon's alleged characterization of the new and novel element of the patent to be the laid-in rubber rim.

On the other hand, plaintiff argues that Judge Gordon referred to the laid-in rubber rim because that was the only thing before him. Thus, there was no issue presented which would require the judge to make any distinction between laid-in and knit-in rubber.

We do not read the various judicial decisions cited by defendants as defendants do. The references to laid-in rubber in these opinions are really concerned with making a distinction between footsocks with rubber threads incorporated through knitting into the rim and footsocks with a rubber band sewn into the rim. Read in proper context, plaintiff's interpretation of the references by the courts to the laid-in rubber rim is correct. For example, the Fourth Circuit opinion in *Wayne-Gossard Corporation v. Moretz Hosiery Mills, Inc., supra*, characterized the Sarbo reissue patent as follows:

> The relevant subject of the original and reissue patents is a knitted stretched yarn foot cover, (to be work in a ladies (sic) shoe), with the method of its manufacture . . . It is enough now to observe that the patentability of the cover and its fashioning, as described in Claims 4 and 5 of the reissue, is found in these characteristics of the cover: its service as a sock in a low-cut shoe, "with the foot cover being of such height as to be positioned below the ankle in foot hugging,

stretched condition, completely concealed from view when worn with low cut shoes"; the absence of any binding or skin-burrowing rim around the foot entry opening; a tubular body adaptable "to function as tip, sole and heel portions" and reversible; and the whole of economical manufacture.

*Id.* 539 F.2d at 988.

Defendant also suggests that laid-in rubber is critical to the Sarbo reissue patent because of the following language in the specification of the patent, " . . . this rubber thread is inserted (e. g. laid-in) in the manner of a woven fabric (Fig. 4A) such that the rubber thread lies substantially along the periphery of the rim and transversely of the knitting direction . . . "

There is nothing in the reissue patent file wrapper or the claim language to indicate that the patentees felt there was something new or novel about footsocks which incorporated rubber threads in the rims through a laying-in method. In fact, any available method of incorporation could be used. The only reference in the patent to the method of incorporation is in the form of an example—the term is preceded by "e. g.", which means "for example". Had the patentee meant to exclude other methods of incorporation, the term laid-in rubber would presumably have been preceded by "i. e.", which means "that is".

The following comment is found in the file wrapper of the original Sarbo patent.[21]

> As to the passage cited by the Examiner in line 21, page 2 of the specification, it is pointed out that the rubber threads 5 are incorporated or knitted into the rim portion. This incorporation or knitting of the rubber threads 5 into the rim is carried out with a known machine according to any known method. The applicant does not claim any method or apparatus for making the rim 2 with inserted rubber threads 5. For the present invention it is only essential that there be no rubber tape or the like around the slip-on opening at the top end of the foot cover.

---

21. Sarbo File Wrapper U.S. Patent No. 3,059,458 at 13.

There are numerous other references in the original patent file wrapper [22] which indicate more concern with the fact of incorporation of rubber threads in the rim than the method of incorporation. There is a similar emphasis on incorporation alone in the reissue patent file wrapper.[23] Accordingly, defendant's position that the file history of the Sarbo patent reveals the criticality of the laid-in rubber rim is unsupported by our examination of the same.

Defendants finally argue that plaintiff made admissions to the criticality of the laid-in rim in the brief it filed for a Writ of Certiorari to the United States Court of Appeals for the Fourth Circuit. The brief stated, *inter alia*,

> As recognized in both opinions below, the combination of elements claimed is new, albeit each individual element per se is old; and one such element, the laid-in rubber in the rim, performs a new function in the combination, i. e., that of holding in place a sock located below the ankle and entirely within the shoe.

Petition, *supra*, at printed pages 12, 13.

This purported admission by plaintiffs states that the laid-in rim is per se old in the art, but that in combination with the other old elements it "performs a new function . . . " Once again, plaintiffs are not claiming anything new or novel about laid-in rubber, and defendants' position is untenable.

Accordingly, in our view, the new and novel function patented by Sarbo is the basic construction of the footsock and its elasticized rim, which is positioned below the ankle in a heretofore unpatented fashion. There is nothing new or novel about laying-in rubber in the rims, and defendants' arguments on this ground must fail.

As further proof that their products are noninfringing, defendants argue that the stretchable tubular fabric that they use in their footsocks has Spandex yarn incorporated into it, and not rubber threads.

Spandex fiber is "[a] manufactured fiber in which the fiber-forming substance is a long chain synthetic elastomer comprised of at least 85 per cent of a segmented polyurethane." [24] Elastomer is defined in The Knitting Dictionary [25] as,

> A synthetic rubber product possessing the physical properties of natural rubber such as high stretchability and recovery. A material to qualify as an estomer (sic), according to the American Society for Testing Materials, should be capable of being repeatedly stretched to at least three times its original length and upon release of the stress return with force to its approximate original length . . .

Although Spandex is a synthetic rubber, persons skilled in the art of knitting footsocks would consider Spandex as within the specification of "rubber" in Claims 4 and 5 of the Sarbo reissue patent. Dalbert U. Shefte, a Charlotte, North Carolina patent attorney, who served as an expert witness for plaintiff, testified, *inter alia*, on direct examination: [26]

> . . . In my experience, Spandex is a type of what is commonly known in the trade as a rubber yarn or rubber thread. Also, there are on machines what are called rubber attachments for feeding rubber, whether it be natural rubber or synthetic rubber . . .
>
> Further, there is nothing in that claim or in the invention, as I have interpreted the patent and in my other studies, that would make any distinction or any significance whether its (sic) natural rubber or synthetic rubber.

The Moretz and Russell companies, against whom plaintiff successfully won infringement suits, both used Spandex in the rims

**22.** *Id.* at 5, 14, 16, 19.

**23.** Sarbo File Wrapper Reissue 26,667 at 1, 8.

**24.** Knitting Dictionary (Charles Reichman, ed. 1966) at 90.

**25.** *Id.* at 29.

**26.** Notes of testimony at 284 (April 27, 1976).

of their footsocks.[27] In fact, all of the Sarbo footsocks are knit with Spandex.[28] Rubber thread and Spandex are equivalent, if not identical for the purposes of this patent.[29] Defendants' use of Spandex thread in the rims of its Style 40 and 50 footsocks does not save them from the charge of infringement.[30]

In *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), the Supreme Court enunciated one of its standards for a determination of infringement. The Court said:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

*Id.* at 607, 70 S.Ct. at 855.

The Sondra Style 40 and 50 footsocks fall clearly within the language in Claims 4 and 5 of the Sarbo reissue patent. The Sondra footsocks are extremely elastic and extensible for being fitted in a highly stretched condition upon the asymmetrical configuration of the lower part of the foot of a wearer with the footsocks being of such height as to be positioned below the ankle in a foot-hugging stretched condition. They are completely concealed from view when worn within low-cut shoes and have seamless stretchable tubular rims including at least some rubber threads—said rims being adapted to form an opening for a foot entry. They have seamless stretchable tubular bodies having an axial length greater than that of said rims and connected with said rims. While the Sondra footsocks use combinations of plain stitches and float stitches, the accused footsocks essentially consist of the same knitted structure throughout their axial length.

The body of the Sondra footsocks are adapted to function as tip, sole and heel portions of the footcover, and upon placing the Sondra footsocks on the lower part of a foot, the attendant stretching of the footsock reduces the combined axial length of the rim and the body and the footsock fits over and hugs on the lower portion of the foot with the rim positioned on the asymmetrical portion of the foot below the ankle. Finally, the combined axial length of the rim and body portions of the Sondra footsocks is within the range of about 5 to 7 centimeters.

There are some distinctions pointed out by defendants—the knit-in-rubber rim and the differences between the knitting stitches, for example, which we find to be insubstantial distinctions.[31] However, even if not so characterized, the Sondra socks clearly would infringe the Sarbo footsocks by virtue of the doctrine of equivalents.

The doctrine of equivalents may be invoked by a patentee when the alleged infringing product ". . . performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank and Mfg. Co. v. Linde Air Products Co., supra* at 608, 70 S.Ct. at 856. The accused object need not copy every literal detail of the patented object it allegedly infringes. All parts of the Sondra footsock perform in essentially the same way as the Sarbo footsocks. De-

---

27. Direct examination of Shepard B. Schwartz, Notes of testimony at 122–3 (April 26, 1976).

28. Cross examination of Robert E. Merritt, Notes of testimony at 69 (April 26, 1976).

29. Direct examination of Dalbert U. Shefte, Notes of testimony at 285 (April 27, 1976).

30. Indeed, the spandex used by Sondra is rubber-covered, because it makes the spandex stronger for dyeing purposes. Deposition of Morris Kaplan, Transcript at 421–423 (April 28, 1976).

31. Defendants also argue that the Liberty Style has a variation in stitches and that the lengthwise measurements of the Sondra footsocks differ from the Sarbo footsocks, depending upon the quality of yarn used. Defendants also argue that the Sondra footsocks do not fit as low on the foot as the Sarbo footsocks do. Finally, they argue that the Sondra demonstration footsocks often fly off a foot model, indicating that the tension in the footsocks is not regulated as effectively as in the Sarbo footsocks.

fendants seek to distinguish their knit-in rubber rims, but the knit-in and laid-in rims function identically to hold the pouch-like body of the footsocks in a tensioned condition on the lower part of the foot. Accordingly, the Sondra footsocks Styles 40 and 50 infringe Claims 4 and 5 of the Sarbo reissue patent No. RE 26,667.

## III. LACHES

In addition to their statutory defenses, defendants also plead the equitable defense of laches. Laches, generally, is:

> . . . neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done, resulting in a disadvantage to the other party. 30A C.J.S. Equity § 112, at 19–20 (1965).

Defendants argue that plaintiff was aware of their manufacturing activity from October of 1964 to February 5, 1974, the time the present suit was filed, and that plaintiff's failure to file suit promptly constituted implicit encouragement to Sondra to continue its business. Plaintiff argues that pursuant to *Jenn-Air Corporation v. Penn Ventilator*, 464 F.2d 48 (3rd Cir. 1972) they were not bound to sue defendants since they were involved in prosecuting other infringement actions. Our resolution of several factual issues in dispute require that defendants' laches defense must fail.

On October 28, 1964, A. Yates Dowell, representing the May Hosiery Mills, sent a letter to companies in the trade informing them that May had an application pending in the U.S. Patent Office.[32] The letter noted reliable information that the addressee was manufacturing a product which would constitute an infringement of the patent, if issued. The letter made a tentative offer regarding licensing agreements and said[33], *inter alia,*

> This letter is written in friendliness to acquaint you with our client's pending application and to let you know that we have been instructed to use every means available to enforce respect for our client's rights upon the issuance of the patent.

On March 26, 1965, Neisner Brothers, Inc. received a letter from David H. Semmes, Esq., attorney for May Hosiery Mills, charging infringement of the Sarbo footsock by defendants. Sometime between March 26, 1965 and April 23, 1965, Harry Price, a patent attorney who represented Sondra and Neisner Brothers, Inc. visited Mr. Schwartz, then President of May Hosiery Mills. Mr. Schwartz testified that Mr. Price, now deceased, informed him that Sondra was purchasing its socks from some other manufacturer.[34] Mr. Schwartz suggested that Sondra enter into a purchase agreement with May, but Mr. Price reported back that Sondra was not interested in any such arrangement.[35]

Since Mr. Price is deceased, information on his participation must be gleaned from the testimony of others. Morris Kaplan, who is the founder of Sondra, testified that Mr. Price always told them that there was ". . . absolutely no connection, . . . no infringement."[36] On March 30, 1965, Harry Price wrote to Mr. Nat Smiley of the Sondra Manufacturing Company, advising him, *inter alia*, that 1) he had met with David Semmes, Esq.; 2) he would order the file history of the Sarbo patent; 3) he believed the low-cut footlets did not infringe the Sarbo patent.[37]

Mr. Price's investigation of the situation apparently continued, and on April 22, 1965 he communicated with David Semmes by

---

**32.** Transcript at 124, 125.

**33.** Defendants' deposition exhibit 9.

**34.** Transcript at 126, 131.

**35.** *Id.*

**36.** *Id.* at 431.

**37.** Defendants' Exhibit 14.

letter apologizing for the delay.[38] The same day, Mr. Price also telegrammed a request to Mr. Semmes for a fifteen to thirty day extension on reporting back regarding the infringement claim.[39] On April 23, 1965, David Semmes wrote to Mr. Price and granted him an extension until May 7, 1965. The letter closed by saying, "If we do not hear from you by May 7, 1965, we are proceeding." [40]

The first suit against Russell Hosiery Mills was filed in 1965.[41] The appeal, which resulted in a finding of invalidity, the application for and issuance of the reissue patent, the filing of the second Russell lawsuit and the subsequent appeal lasted from 1967 to 1973. Wayne-Gossard filed suit against Moretz Hosiery Mills in 1973. The present lawsuit was filed on February 5, 1974, while the Moretz lawsuit was still pending.[42] Thus, the threat of "proceeding" delivered in April of 1965, was not carried out for almost nine years.

On December 6, 1967, Harry Price wrote to plaintiffs saying that Sondra had avoided infringing the original Sarbo patent. S. B. Schwartz testified that, this letter ". . led [him] to believe that they had stopped infringing." [43]

■ The fact that plaintiffs were involved in other litigation does not provide an automatic excuse for any delay in bringing suit against defendants. *American Home Products Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1123 (6th Cir. 1973). In *American Home Products Corp., etc., supra*, the Sixth Circuit held plaintiff's claims barred by laches because it had failed to give plaintiff bare notice of its intent to pursue its rights under the patent. The Court held,

> This notification is important, partly because it puts the accused infringer on

notice that a suit will be filed against him on this issue, and partly because it permits him to bring a declaratory judgment action if the delay in waiting for a judicial determination would be a burden upon his proposed operation.

*Id.* at 1123. The court also held that the totality of the circumstances must be examined before a finding of laches can be made.

■ Laches is an equitable principle, and the court must make a decision regarding the applicability of laches through an examination of the facts of this case standing alone. *Westco-Chippewa Pump Co. v. Delaware Electric and Supply Co.*, 64 F.2d 185, 187 (3rd Cir. 1933). Plaintiff has been continuously involved in litigation regarding the original and reissue Sarbo patents since September of 1969. Defendants have proven that plaintiff did not issue them any notice of infringement of the reissue patent. But this proof, standing alone, does not establish the elements required for a finding that laches will serve as a bar to the suit.

In order to prevail, defendants must show more than a mere,

> . . . lapse of time; as an equitable defense [laches] is determined in light of all the existing circumstances and requires that the delay be unreasonable and cause prejudice to the adversary.

*Sobosle v. United States Steel Corporation*, 359 F.2d 7, 12 (3rd Cir. 1966). It must appear that plaintiff has been inexcusably delinquent in asserting its rights so that a decision against defendants would be unfair. *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946).

■ In *Jenn-Air Corporation v. Penn Ventilator Co.*, 464 F.2d 48 (3rd Cir. 1972), the Third Circuit held, " . . . [plaintiff] is not necessarily bound to take on

---

**38.** Defendants' Exhibit 12.

**39.** Defendants' Exhibit 14.

**40.** Defendants' Exhibit 13.

**41.** Transcript at 9.

**42.** Transcript at 11–13.

**43.** Transcript at 132; Plaintiff's Exhibit 66.

more than one infringer at a time." *Id.* at 50. Since plaintiff was actively engaged in other litigation regarding the patent, the delay is excusable and understandable. Basic logistical problems would have been engendered by the prosecution of simultaneous lawsuits in North Carolina and Pennsylvania. When defendants filed the instant lawsuit, they were awaiting the decision of the trial court in the *Moretz* case. This Court finds it reasonable that plaintiffs chose to pursue the instant litigation after the completion of the trial of the previous infringement action. We do not find the delay in bringing the lawsuit was unreasonable.

Defendants have failed to prove that the delay was prejudicial to their interests. In fact, Sondra has earned profits greatly in excess of its investment, which Sondra has conceded was not substantial. Wedgewood and Liberty simply used existing machines to make the Sondra footsocks, and made no investment. The defendants were thus actually benefitted by the delay.

Defendants rely finally on *Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc.*, 3rd Cir. 1976, 532 F.2d 330, as an exception to the *Jenn-Air* case. Defendants' reliance on *Minnesota Mining* is misplaced, however, because the patentee therein had actively misled the accused infringer. The Minnesota Mining Company entered into a cooperative arrangement with Berwick whereby Minnesota Mining supplied, for a year, the material used to make the accused product. No such activity by patentee is here involved.

■ Defendants have failed to carry their burden of establishing laches. They have not proven that the delay was unreasonable or that they were prejudiced by the delay. Accordingly, plaintiff's claims against defendants are not barred by the equitable defense of laches.

## IV. INTERVENING RIGHTS

Title 35 U.S.C. § 252 provides, *inter alia*,

No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue. July 19, 1952, c. 950, § 1, 66 Stat. 808.

Under the provisions of § 252, Sondra was completely within its rights in selling the footsocks in its inventory as of the date of the Sarbo reissue patent, September 23, 1969. Plaintiff has asserted no claims for damages for the footsocks in this category.

Plaintiff argues that since the patent in issue is a narrowed reissue patent, the doctrine of intervening rights does not apply. Plaintiff contends further that even if the doctrine were applicable to narrowed reissues, defendants are not entitled to the benefit of the doctrine's operation on the merits of the case. It is defendants' position that the doctrine of intervening rights does apply to narrowed reissue patents. Defendants urge the court to fashion an equitable remedy commensurate with the substantiality of the business commenced before and continued by Sondra after the reissue patent was granted.

■ We agree with the finding of the United States Court of Appeals for the Fourth Circuit in *Wayne-Gossard Corporation v. Moretz Hosiery Mills, Inc.*, No. 75–1240, 539 F.2d 986 (4th Cir. 1976) that the doctrine of intervening rights applies to narrowed reissue patents. In support of its position, the Court cited the views of P. J. Federico, Examiner-in-Chief of the United States Patent Office. In an article entitled, "Intervening Rights in Patent Reissues," 30 Geo.Wash.L.Rev. 603 (1961–1962), Federico stated:

> The test which has been mentioned applied not only in the case of broadened reissues; it would protect intervening rights in cases of narrowed reissues as well, which marks another departure from what may be considered to have been the prior case law. Assume an original patent with one broad claim which might have been infringed and a reissue of this patent which omits this broad claim and contains only a new narrower claim which is infringed by the defendant. If the other conditions of the statute are present the defendant will have a claim to be protected to a certain extent, since he does not infringe a repeated original claim.

*Id.* at 632.

■ Although we hold that the doctrine of intervening rights applies to narrowed reissues, we do not believe that the circumstances of this case warrant its application herein. Counsel for defendants has said and we independently find that the investment by defendants in the production of the infringing footsocks prior to the date of the grant of the reissue was insubstantial and has been greatly offset by the profits realized.[44]

Sondra also presented its $93,454 advertising bill as evidence of further investment. But Sondra was selling several brands of footsocks, and this advertising inured to the benefit of Sondra's entire line of footsocks. In addition, defendants have the benefit of the five years of operation, from 1965 to 1969, from which no damages can be assessed. Sondra sold in excess of 81 million pairs of footsocks during that period, and they have been rewarded with increased sales without liability hereunder for damages or royalty fees.

Defendants actually seek to have the Court grant it the right to continue to infringe the Sarbo reissue patent and expand without royalty fees or damages. Such relief for defendants would effectively extinguish the rights of the patentee under the guise of protecting the investments of the infringers. This, in our view, would not be equitable.

The evidence presented reveals that Wedgewood and Liberty used their existing machines in making the Sondra footsocks. Thus, neither of those defendants have any investment at all to protect. Accordingly, although we hold that the doctrine of intervening rights applies to narrowed reissues, we do not think it equitable on the facts of this case and the evidence presented to apply the doctrine in favor of the defendants.

## V. NOTICE

Title 35 United States Code § 287 provides for the giving of notice of infringement to the accused infringer.[45] Plaintiffs concede that they gave defendants no actual notice of infringement of the reissue patent until February 5, 1974, the date of the filing of the suit.[46] But plaintiff argues that defendants received constructive notice of the infringement since plaintiff marked the packages of the footsocks sold after

---

44. Sondra invested approximately $10,000 when it shifted to the manufacture of the accused footsocks.

45. The statutory provision is set out in full in Conclusion of Law number 6.

46. Transcript at 1024.

September 23, 1969 with the reissue patent number.[47]

The statute clearly states that the patent number should be marked on the patented article unless, " . . . from the character of the article, this can not be done . . . " Shepard Schwartz testified for plaintiff that the footsocks could have been marked through the transfer process on the foot, sole or heel,[48] but that the marking would deface the footsocks and would be too expensive. Plaintiff also argues that it is not the custom in the trade to actually mark the footsocks.

 The statute sets forth the requirements for constructive notice, and provides for alternative marking only when the article cannot be directly marked. The Court finds that the transfer process could be used on the foot, sole, or heel of the sock without defacing the article. The Court recognizes that there may be a point where the marking could be so expensive as to be impractical. But plaintiff has offered no evidence from which the Court could 1) make a determination of what the expense would be, or 2) conclude that the marking of the footsocks would be so expensive as to be prohibitive. The custom of the trade is not a relevant consideration under the statute, and the fact that others do not mark their footsocks does not excuse plaintiff.

 The Court cannot rely on the fact that because of the expense involved Sondra does not mark its footsocks directly. The statute does not require notice unless you wish to seek damages. Sondra seeks none, and its actions are therefore not relevant. We thus hold that the marking of the footsock packages by plaintiff did not constitute constructive notice of infringement to defendants.

 Also, we note that from 1965 plaintiff knew of Sondra's activities in the knitting field, and was familiar with the in-

fringing product. And yet plaintiff failed to give actual notice of its claim of infringement under the reissue patent. A simple and inexpensive statutory alternative to marking the footsock was always available to plaintiff. Plaintiff could have preserved its right to damages with one letter of notice. Since plaintiff did not, we hold that defendants received actual notice of infringement of the Sarbo reissue patent on February 5, 1974, when the complaint was filed in this action.

## VI. ATTORNEY FEES

Title 35 United States Code § 285 provides:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party. July 19, 1952, c. 950, § 1, 66 Stat. 813.

Plaintiff claims entitlement to attorney fees because they were required to again prove the validity of the reissue patent although it has been twice found valid and the decisions affirmed.

 We nevertheless find that this case is not exceptional. Plaintiff has not proven any unfairness, vexatiousness or bad faith on the part of defendants, and such an award should not be granted simply as a matter of course. We believe that the defendants questioned the validity of the Sarbo patent in good faith. Most of the evidence presented with regard to validity would probably have been presented as background for the Court's consideration of the infringement. In any event, the Court would have found it difficult to try the infringement issue without the evidence regarding validity.

The Court accordingly finds that this case is not an exceptional one as contemplated in § 285, and no attorney fees will be awarded to plaintiff.

## VII. CONCLUSION

Claims 4 and 5 of Sarbo Reissue Patent No. 26,667 are valid and Sondra's Style 40

---

**47.** Finding of Fact 86.

**48.** Transcript at 984.

and 50 footsocks infringe. The defenses of laches, estoppel and intervening rights have not been established. Plaintiff is entitled to injunctive relief against defendants enjoining future infringement. Also, plaintiff is entitled to damages from the date of notice.